# ALDEN ET AL. *v.* MAINE

No. 98–436.   Argued March 31, 1999—Decided June 23, 1999

708

710

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, and THOMAS, JJ., joined. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post*, p. 760.

*Laurence Gold* argued the cause for petitioners. With him on the briefs were *Jonathan P. Hiatt, Timothy L. Belcher,* and *David L. Shapiro.*

*Solicitor General Waxman* argued the cause for intervenor United States. With him on the briefs were *Assistant Attorney General Hunger, Acting Assistant Attorney General Ogden, Deputy Solicitor General Kneedler, Irving L.*

*Gornstein, Mark B. Stern, Robert M. Loeb, Peter J. Smith, Allen H. Feldman, Nathaniel I. Spiller,* and *Ellen L. Beard.*

*Andrew Ketterer,* Attorney General of Maine, argued the cause for respondent. With him on the brief were *Paul Stern,* Deputy Attorney General, and *Peter J. Brann,* State Solicitor.*

JUSTICE KENNEDY delivered the opinion of the Court.

In 1992, petitioners, a group of probation officers, filed suit against their employer, the State of Maine, in the United States District Court for the District of Maine. The officers alleged the State had violated the overtime provisions of the Fair Labor Standards Act of 1938 (FLSA), 52 Stat. 1060, as

---

*Briefs of *amici curiae* urging reversal were filed for the Association of American Publishers, Inc., et al. by *Charles S. Sims;* and for the National Association of Police Organizations by *Stephen R. McSpadden.*

Briefs of *amici curiae* urging affirmance were filed for the Commonwealth of Kentucky by *Stuart E. Alexander III;* for the State of Maryland et al. by *J. Joseph Curran, Jr.,* Attorney General of Maryland, and *Andrew H. Baida* and *Michele J. McDonald,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Bill Pryor* of Alabama, *Janet Napolitano* of Arizona, *Mark Pryor* of Arkansas, *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Thurbert E. Baker* of Georgia, *Margery S. Bronster* of Hawaii, *Alan G. Lance* of Idaho, *Jeffrey A. Modisett* of Indiana, *Thomas J. Miller* of Iowa, *Carla J. Stovall* of Kansas, *Thomas F. Reilly* of Massachusetts, *Jennifer M. Granholm* of Michigan, *Mike Moore* of Mississippi, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Philip T. Mc-Laughlin* of New Hampshire, *Peter Verniero* of New Jersey, *Eliot Spitzer* of New York, *Heidi Heitkamp* of North Dakota, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Sheldon Whitehouse* of Rhode Island, *Charles M. Condon* of South Carolina, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *John Cornyn* of Texas, *Jan Graham* of Utah, *William H. Sorrell* of Vermont, *Mark L. Earley* of Virginia, *Darrell V. McGraw* of West Virginia, *James E. Doyle* of Wisconsin, and *Guy Woodhouse* of Wyoming; for the Home School Legal Defense Association by *Michael P. Farris;* for the Pacific Legal Foundation by *M. Reed Hopper;* and for the National Conference of State Legislatures et al. by *Richard Ruda* and *Richard H. Seamon.*

amended, 29 U. S. C. §201 *et seq.* (1994 ed. and Supp. III), and sought compensation and liquidated damages. While the suit was pending, this Court decided *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44 (1996), which made it clear that Congress lacks power under Article I to abrogate the States' sovereign immunity from suits commenced or prosecuted in the federal courts. Upon consideration of *Seminole Tribe,* the District Court dismissed petitioners' action, and the Court of Appeals affirmed. *Mills* v. *Maine,* 118 F. 3d 37 (CA1 1997). Petitioners then filed the same action in state court. The state trial court dismissed the suit on the basis of sovereign immunity, and the Maine Supreme Judicial Court affirmed. 715 A. 2d 172 (1998).

The Maine Supreme Judicial Court's decision conflicts with the decision of the Supreme Court of Arkansas, *Jacoby* v. *Arkansas Dept. of Ed.,* 331 Ark. 508, 962 S. W. 2d 773 (1998), and calls into question the constitutionality of the provisions of the FLSA purporting to authorize private actions against States in their own courts without regard for consent, see 29 U. S. C. §§216(b), 203(x). In light of the importance of the question presented and the conflict between the courts, we granted certiorari. 525 U. S. 981 (1998). The United States intervened as a petitioner to defend the statute.

We hold that the powers delegated to Congress under Article I of the United States Constitution do not include the power to subject nonconsenting States to private suits for damages in state courts. We decide as well that the State of Maine has not consented to suits for overtime pay and liquidated damages under the FLSA. On these premises we affirm the judgment sustaining dismissal of the suit.

I

The Eleventh Amendment makes explicit reference to the States' immunity from suits "commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U. S.

Const., Amdt. 11. We have, as a result, sometimes referred to the States' immunity from suit as "Eleventh Amendment immunity." The phrase is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, nor is limited by, the terms of the Eleventh Amendment. Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments.

## A

Although the Constitution establishes a National Government with broad, often plenary authority over matters within its recognized competence, the founding document "specifically recognizes the States as sovereign entities." *Seminole Tribe of Fla.* v. *Florida, supra,* at 71, n. 15; accord, *Blatchford* v. *Native Village of Noatak,* 501 U. S. 775, 779 (1991) ("[T]he States entered the federal system with their sovereignty intact"). Various textual provisions of the Constitution assume the States' continued existence and active participation in the fundamental processes of governance. See *Printz* v. *United States,* 521 U. S. 898, 919 (1997) (citing Art. III, §2; Art. IV, §§2–4; Art. V). The limited and enumerated powers granted to the Legislative, Executive, and Judicial Branches of the National Government, moreover, underscore the vital role reserved to the States by the constitutional design, see, *e. g.,* Art. I, §8; Art. II, §§2–3; Art. III, §2. Any doubt regarding the constitutional role of the States as sovereign entities is removed by the Tenth Amendment, which, like the other provisions of the Bill of Rights, was enacted to allay lingering concerns about the extent of

the national power. The Amendment confirms the promise implicit in the original document: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U. S. Const., Amdt. 10; see also *Printz, supra,* at 919; *New York* v. *United States,* 505 U. S. 144, 156–159, 177 (1992).

The federal system established by our Constitution preserves the sovereign status of the States in two ways. First, it reserves to them a substantial portion of the Nation's primary sovereignty, together with the dignity and essential attributes inhering in that status. The States "form distinct and independent portions of the supremacy, no more subject, within their respective spheres, to the general authority than the general authority is subject to them, within its own sphere." The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison).

Second, even as to matters within the competence of the National Government, the constitutional design secures the founding generation's rejection of "the concept of a central government that would act upon and through the States" in favor of "a system in which the State and Federal Governments would exercise concurrent authority over the people—who were, in Hamilton's words, 'the only proper objects of government.'" *Printz, supra,* at 919–920 (quoting The Federalist No. 15, at 109); accord, *New York, supra,* at 166 ("The Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States"). In this the Founders achieved a deliberate departure from the Articles of Confederation: Experience under the Articles had "exploded on all hands" the "practicality of making laws, with coercive sanctions, for the States as political bodies." 2 Records of the Federal Convention of 1787, p. 9 (M. Farrand ed. 1911) (J. Madison); accord, The Federalist No. 20, at 138 (J. Madison and A. Hamilton); James Iredell: Some

Objections to the Constitution Answered, reprinted in 3 Annals of America 249 (1976).

The States thus retain "a residuary and inviolable sovereignty." The Federalist No. 39, at 245. They are not relegated to the role of mere provinces or political corporations, but retain the dignity, though not the full authority, of sovereignty.

## B

The generation that designed and adopted our federal system considered immunity from private suits central to sovereign dignity. When the Constitution was ratified, it was well established in English law that the Crown could not be sued without consent in its own courts. See *Chisholm* v. *Georgia*, 2 Dall. 419, 437–446 (1793) (Iredell, J., dissenting) (surveying English practice); cf. *Nevada* v. *Hall*, 440 U. S. 410, 414 (1979) ("The immunity of a truly independent sovereign from suit in its own courts has been enjoyed as a matter of absolute right for centuries. Only the sovereign's own consent could qualify the absolute character of that immunity"). In reciting the prerogatives of the Crown, Blackstone—whose works constituted the preeminent authority on English law for the founding generation—underscored the close and necessary relationship understood to exist between sovereignty and immunity from suit:

> "And, first, the law ascribes to the king the attribute of sovereignty, or pre-eminence. . . . Hence it is, that no suit or action can be brought against the king, even in civil matters, because no court can have jurisdiction over him. For all jurisdiction implies superiority of power . . . ." 1 W. Blackstone, Commentaries on the Laws of England 234–235 (1765).

Although the American people had rejected other aspects of English political theory, the doctrine that a sovereign could not be sued without its consent was universal in the

States when the Constitution was drafted and ratified. See *Chisholm, supra,* at 434–435 (Iredell, J., dissenting) ("I believe there is no doubt that neither in the State now in question, nor in any other in the *Union,* any particular Legislative mode, authorizing a compulsory suit for the recovery of money against a State, was in being either when the Constitution was adopted, or at the time the judicial act was passed"); *Hans* v. *Louisiana,* 134 U. S. 1, 16 (1890) ("The suability of a State, without its consent, was a thing unknown to the law. This has been so often laid down and acknowledged by courts and jurists that it is hardly necessary to be formally asserted").

The ratification debates, furthermore, underscored the importance of the States' sovereign immunity to the American people. Grave concerns were raised by the provisions of Article III, which extended the federal judicial power to controversies between States and citizens of other States or foreign nations. As we have explained:

> "Unquestionably the doctrine of sovereign immunity was a matter of importance in the early days of independence. Many of the States were heavily indebted as a result of the Revolutionary War. They were vitally interested in the question whether the creation of a new federal sovereign, with courts of its own, would automatically subject them, like lower English lords, to suits in the courts of the 'higher' sovereign." *Hall, supra,* at 418 (footnote omitted).

The leading advocates of the Constitution assured the people in no uncertain terms that the Constitution would not strip the States of sovereign immunity. One assurance was contained in The Federalist No. 81, written by Alexander Hamilton:

> "It is inherent in the nature of sovereignty not to be amenable to the suit of an individual *without its consent.* This is the general sense and the general practice of

mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every State in the Union. Unless, therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the States and the danger intimated must be merely ideal. . . . [T]here is no color to pretend that the State governments would, by the adoption of that plan, be divested of the privilege of paying their own debts in their own way, free from every constraint but that which flows from the obligations of good faith. The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force. They confer no right of action independent of the sovereign will. To what purpose would it be to authorize suits against States for the debts they owe? How could recoveries be enforced? It is evident that it could not be done without waging war against the contracting State; and to ascribe to the federal courts, by mere implication, and in destruction of a preexisting right of the State governments, a power which would involve such a consequence, would be altogether forced and unwarrantable." *Id.*, at 487–488 (emphasis in original).

At the Virginia ratifying convention, James Madison echoed this theme:

"Its jurisdiction in controversies between a state and citizens of another state is much objected to, and perhaps without reason. It is not in the power of individuals to call any state into court. . . .

". . . It appears to me that this [clause] can have no operation but this—to give a citizen a right to be heard in the federal courts; and if a state should condescend to be a party, this court may take cognizance of it." 3 Debates on the Federal Constitution 533 (J. Elliot 2d ed. 1854) (hereinafter Elliot's Debates).

When Madison's explanation was questioned, John Marshall provided immediate support:

"With respect to disputes between *a state and the citizens of another state,* its jurisdiction has been decried with unusual vehemence. I hope no gentleman will think that a state will be called at the bar of the federal court. Is there no such case at present? Are there not many cases in which the legislature of Virginia is a party, and yet the state is not sued? It is not rational to suppose that the sovereign power should be dragged before a court. The intent is, to enable states to recover claims of individuals residing in other states. I contend this construction is warranted by the words. But, say they, there will be partiality in it if a state cannot be defendant . . . . It is necessary to be so, and cannot be avoided. I see a difficulty in making a state defendant, which does not prevent its being plaintiff." 3 *id.,* at 555–556 (emphasis in original).

Although the state conventions which addressed the issue of sovereign immunity in their formal ratification documents sought to clarify the point by constitutional amendment, they made clear that they, like Hamilton, Madison, and Marshall, understood the Constitution as drafted to preserve the States' immunity from private suits. The Rhode Island Convention thus proclaimed that "[i]t is declared by the Convention, that the judicial power of the United States, in cases in which a state may be a party, does not extend to criminal prosecutions, or to authorize any suit by any person against a state." 1 *id.,* at 336. The convention sought, in addition, an express amendment "to remove all doubts or controversies respecting the same." *Ibid.* In a similar fashion, the New York Convention "declare[d] and ma[d]e known," 1 *id.,* at 327, its understanding "[t]hat the judicial power of the United States, in cases in which a state may be a party, does not extend to criminal prosecutions, or to authorize any suit

by any person against a state," 1 *id.*, at 329. The convention proceeded to ratify the Constitution "[u]nder these impressions, and declaring that the rights aforesaid cannot be abridged or violated, and that the explanations aforesaid are consistent with the said Constitution, and in confidence that the amendments which shall have been proposed to the said Constitution will receive an early and mature consideration." *Ibid.*

Despite the persuasive assurances of the Constitution's leading advocates and the expressed understanding of the only state conventions to address the issue in explicit terms, this Court held, just five years after the Constitution was adopted, that Article III authorized a private citizen of another State to sue the State of Georgia without its consent. *Chisholm* v. *Georgia*, 2 Dall. 419 (1793). Each of the four Justices who concurred in the judgment issued a separate opinion. The common theme of the opinions was that the case fell within the literal text of Article III, which by its terms granted jurisdiction over controversies "between a State and Citizens of another State," and "between a State, or the Citizens thereof, and foreign States, Citizens, or Subjects." U. S. Const., Art. III, § 2. The argument that this provision granted jurisdiction only over cases in which the State was a plaintiff was dismissed as inconsistent with the ordinary meaning of "between," and with the provision extending jurisdiction to "Controversies between two or more States," which by necessity contemplated jurisdiction over suits to which States were defendants. Two Justices also argued that sovereign immunity was inconsistent with the principle of popular sovereignty established by the Constitution, 2 Dall., at 454–458 (Wilson, J.); *id.*, at 470–472 (Jay, C. J.); although the others did not go so far, they contended that the text of Article III evidenced the States' surrender of sovereign immunity as to those provisions extending jurisdiction over suits to which States were parties, *id.*, at 452 (Blair, J.); *id.*, at 468 (Cushing, J.).

Justice Iredell dissented, relying on American history, *id.*, at 434–435, English history, *id.*, at 437–446, and the principles of enumerated powers and separate sovereignty, *id.*, at 435–436, 448, 449–450. See generally *Hans*, 134 U. S., at 12 ("The other justices were more swayed by a close observance of the letter of the Constitution, without regard to former experience and usage . . . . Justice Iredell, on the contrary, contended that it was not the intention to create new and unheard of remedies, by subjecting sovereign States to actions at the suit of individuals, (which he conclusively showed was never done before,) but only . . . to invest the federal courts with jurisdiction to hear and determine controversies and cases, between the parties designated, that were properly susceptible of litigation in courts").

The Court's decision "fell upon the country with a profound shock." 1 C. Warren, The Supreme Court in United States History 96 (rev. ed. 1926); accord, *Hans, supra,* at 11; *Principality of Monaco* v. *Mississippi,* 292 U. S. 313, 325 (1934); *Seminole Tribe,* 517 U. S., at 69. "Newspapers representing a rainbow of opinion protested what they viewed as an unexpected blow to state sovereignty. Others spoke more concretely of prospective raids on state treasuries." D. Currie, The Constitution in Congress: The Federalist Period 1789–1801, p. 196 (1997).

The States, in particular, responded with outrage to the decision. The Massachusetts Legislature, for example, denounced the decision as "repugnant to the first principles of a federal government," and called upon the Commonwealth's Senators and Representatives to take all necessary steps to "remove any clause or article of the . . . Constitution, which can be construed to imply or justify a decision, that, a State is compellable to answer in any suit by an individual or individuals in any Court of the United States." 15 Papers of Alexander Hamilton 314 (H. Syrett & J. Cooke eds. 1969) (internal quotation marks omitted). Georgia's response was more intemperate: Its House of Representatives passed a bill

providing that anyone attempting to enforce the *Chisholm* decision would be "'guilty of felony and shall suffer death, without benefit of clergy, by being hanged.'" Currie, *supra*, at 196.

An initial proposal to amend the Constitution was introduced in the House of Representatives the day after *Chisholm* was announced; the proposal adopted as the Eleventh Amendment was introduced in the Senate promptly following an intervening recess. Currie, *supra*, at 196. Congress turned to the latter proposal with great dispatch; little more than two months after its introduction it had been endorsed by both Houses and forwarded to the States. 4 Annals of Congress 25, 30, 477, 499 (1794); 1 Stat. 402.

Each House spent but a single day discussing the Amendment, and the vote in each House was close to unanimous. See 4 Annals of Congress, at 30–31, 476–478 (the Senate divided 23 to 2; the House 81 to 9). All attempts to weaken the Amendment were defeated. Congress in succession rejected proposals to limit the Amendment to suits in which "'the cause of action shall have arisen before the ratification of the amendment,'" or even to cases "'where such State shall have previously made provision in their own Courts, whereby such suit may be prosecuted to effect'"; it refused as well to make an exception for "'cases arising under treaties made under the authority of the United States.'" 4 *id.*, at 30, 476.

It might be argued that the *Chisholm* decision was a correct interpretation of the constitutional design and that the Eleventh Amendment represented a deviation from the original understanding. This, however, seems unsupportable. First, despite the opinion of Justice Iredell, the majority failed to address either the practice or the understanding that prevailed in the States at the time the Constitution was adopted. Second, even a casual reading of the opinions suggests the majority suspected the decision would be unpopular and surprising. See, *e. g.*, 2 Dall., at 454–455 (Wilson, J.)

(condemning the prevailing conception of sovereignty); *id.*, at 468 (Cushing, J.) ("If the Constitution is found inconvenient in practice in this or any other particular, it is well that a regular mode is pointed out for amendment"); *id.*, at 478–479 (Jay, C. J.) ("[T]here is reason to hope that the people of [Georgia] will yet perceive that [sovereign immunity] would not have been consistent with [republican] equality"); cf. *id.*, at 419–420 (attorney for Chisholm) ("I did not want the remonstrance of *Georgia*, to satisfy me, that the motion, which I have made is unpopular. Before that remonstrance was read, I had learnt from the acts of another State, whose will must be always dear to me, that she too condemned it"). Finally, two Members of the majority acknowledged that the United States might well remain immune from suit despite Article III's grant of jurisdiction over "Controversies to which the United States shall be a Party," see *id.*, at 469 (Cushing, J.); *id.*, at 478 (Jay, C. J.), and, invoking the example of actions to collect debts incurred before the Constitution was adopted, one raised the possibility of "exceptions," suggesting the rule of the case might not "extend to all the demands, and to every kind of action," *id.*, at 479 (Jay, C. J.). These concessions undercut the crucial premise that either the Constitution's literal text or the principle of popular sovereignty necessarily overrode widespread practice and opinion.

The text and history of the Eleventh Amendment also suggest that Congress acted not to change but to restore the original constitutional design. Although earlier drafts of the Amendment had been phrased as express limits on the judicial power granted in Article III, see, *e. g.*, 3 Annals of Congress 651–652 (1793) ("The Judicial Power of the United States shall not extend to any suits in law or equity, commenced or prosecuted against one of the United States . . ."), the adopted text addressed the proper interpretation of that provision of the original Constitution, see U. S. Const., Amdt. 11 ("The Judicial power of the United States shall not

be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States . . .").
By its terms, then, the Eleventh Amendment did not redefine the federal judicial power but instead overruled the Court:

> "This amendment, expressing the will of the ultimate sovereignty of the whole country, superior to all legislatures and all courts, actually reversed the decision of the Supreme Court. It did not in terms prohibit suits by individuals against the States, but declared that the Constitution should not be construed to import any power to authorize the bringing of such suits. . . . The Supreme Court had construed the judicial power as extending to such a suit, and its decision was thus overruled." *Hans*, 134 U. S., at 11.

The text reflects the historical context and the congressional objective in endorsing the Amendment for ratification. Congress chose not to enact language codifying the traditional understanding of sovereign immunity but rather to address the specific provisions of the Constitution that had raised concerns during the ratification debates and formed the basis of the *Chisholm* decision. Cf. 15 Papers of Alexander Hamilton, at 314 (quoted *supra*, at 720). Given the outraged reaction to *Chisholm*, as well as Congress' repeated refusal to otherwise qualify the text of the Amendment, it is doubtful that if Congress meant to write a new immunity into the Constitution it would have limited that immunity to the narrow text of the Eleventh Amendment:

> "Can we suppose that, when the Eleventh Amendment was adopted, it was understood to be left open for citizens of a State to sue their own state in the federal courts, whilst the idea of suits by citizens of other states, or of foreign states, was indignantly repelled? Suppose that Congress, when proposing the Eleventh Amendment, had appended to it a proviso that nothing therein

contained should prevent a State from being sued by its own citizens in cases arising under the Constitution or laws of the United States: can we imagine that it would have been adopted by the States? The supposition that it would is almost an absurdity on its face." *Hans, supra,* at 14–15.

The more natural inference is that the Constitution was understood, in light of its history and structure, to preserve the States' traditional immunity from private suits. As the Amendment clarified the only provisions of the Constitution that anyone had suggested might support a contrary understanding, there was no reason to draft with a broader brush.

Finally, the swiftness and near unanimity with which the Eleventh Amendment was adopted suggest "either that the Court had not captured the original understanding, or that the country had changed its collective mind most rapidly." D. Currie, The Constitution in the Supreme Court: The First Hundred Years: 1789–1888, p. 18, n. 101 (1985). The more reasonable interpretation, of course, is that regardless of the views of four Justices in *Chisholm,* the country as a whole— which had adopted the Constitution just five years earlier— had not understood the document to strip the States of their immunity from private suits. Cf. Currie, The Constitution in Congress, at 196 ("It is plain that just about everybody in Congress agreed the Supreme Court had misread the Constitution").

Although the dissent attempts to rewrite history to reflect a different original understanding, its evidence is unpersuasive. The handful of state statutory and constitutional provisions authorizing suits or petitions of right against States only confirms the prevalence of the traditional understanding that a State could not be sued in the absence of an express waiver, for if the understanding were otherwise, the provisions would have been unnecessary. The constitutional amendments proposed by the New York and Rhode Island Conventions undercut rather than support the dissent's view

of history, see *supra,* at 718–719, and the amendments proposed by the Virginia and North Carolina Conventions do not cast light upon the original understanding of the States' immunity to suit. It is true that, in the course of all but eliminating federal-question and diversity jurisdiction, see 3 Elliot's Debates 660–661 (amendment proposed by the Virginia Convention limiting the federal-question jurisdiction to suits arising under treaties and the diversity jurisdiction to suits between parties claiming lands under grants from different States); 4 *id.,* at 246 (identical amendment proposed by the North Carolina Convention), the amendments would have removed the language in the Constitution relied upon by the *Chisholm* Court. While the amendments do reflect dissatisfaction with the scope of federal jurisdiction as a general matter, there is no evidence that they were directed toward the question of sovereign immunity or that they reflect an understanding that the States would be subject to private suits without consent under Article III as drafted.

The dissent's remaining evidence cannot bear the weight the dissent seeks to place on it. The views voiced during the ratification debates by Edmund Randolph and James Wilson, when reiterated by the same individuals in their respective capacities as advocate and Justice in *Chisholm,* were decisively rejected by the Eleventh Amendment, and General Pinkney did not speak to the issue of sovereign immunity at all. Furthermore, Randolph appears to have recognized that his views were in tension with the traditional understanding of sovereign immunity, see 3 Elliot's Debates 573 ("I think, whatever the law of nations may say, that any doubt respecting the construction that a state may be plaintiff, and not defendant, is taken away by the words *where a state shall be a party*"), and Wilson and Pinkney expressed a radical nationalist vision of the constitutional design that not only deviated from the views that prevailed at the time but, despite the dissent's apparent embrace of the position, remains startling even today, see *post,* at 776

(quoting with approval Wilson's statement that " 'the government of each state ought to be subordinate to the government of the United States' "). Nor do the controversial early suits prosecuted against Maryland and New York reflect a widespread understanding that the States had surrendered their immunity to suit. Maryland's decision to submit to process in *Vanstophorst* v. *Maryland*, 2 Dall. 401 (1791), aroused great controversy, see Marcus & Wexler, Suits Against States: Diversity of Opinion in the 1790s, 1993 J. Sup. Ct. History 73, 74–75, and did not go unnoticed by the Supreme Court, see *Chisholm*, 2 Dall., at 429–430 (Iredell, J., dissenting). In *Oswald* v. *New York*, the State refused to respond to the plaintiff's summons until after the decision in *Chisholm* had been announced; even then it at first asserted the defense that it was "a free, sovereign and independent State," and could not be "drawn or compelled" to defend the suit. Marcus & Wexler, *supra*, at 76–77 (internal quotation marks omitted). And, though the Court's decision in *Chisholm* may have had "champions 'every bit as vigorous in defending their interpretation of the Constitution as were those partisans on the other side of the issue,' " *post*, at 794, the vote on the Eleventh Amendment makes clear that they were decidedly less numerous. See *supra*, at 721.

In short, the scanty and equivocal evidence offered by the dissent establishes no more than what is evident from the decision in *Chisholm*—that some members of the founding generation disagreed with Hamilton, Madison, Marshall, Iredell, and the only state conventions formally to address the matter. The events leading to the adoption of the Eleventh Amendment, however, make clear that the individuals who believed the Constitution stripped the States of their immunity from suit were at most a small minority.

Not only do the ratification debates and the events leading to the adoption of the Eleventh Amendment reveal the original understanding of the States' constitutional immunity from suit; they also underscore the importance of sovereign

immunity to the founding generation. Simply put, "The Constitution never would have been ratified if the States and their courts were to be stripped of their sovereign authority except as expressly provided by the Constitution itself." *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 239, n. 2 (1985); accord, *Edelman* v. *Jordan,* 415 U. S. 651, 660 (1974).

### C

The Court has been consistent in interpreting the adoption of the Eleventh Amendment as conclusive evidence "that the decision in *Chisholm* was contrary to the well-understood meaning of the Constitution," *Seminole Tribe,* 517 U. S., at 69, and that the views expressed by Hamilton, Madison, and Marshall during the ratification debates, and by Justice Iredell in his dissenting opinion in *Chisholm,* reflect the original understanding of the Constitution. See, *e. g., Hans,* 134 U. S., at 12, 14–15, 18–19; *Principality of Monaco,* 292 U. S., at 325; *Edelman, supra,* at 660, n. 9; *Seminole Tribe, supra,* at 70, and nn. 12–13. In accordance with this understanding, we have recognized a "presumption that no anomalous and unheard-of proceedings or suits were intended to be raised up by the Constitution—anomalous and unheard of when the constitution was adopted." *Hans,* 134 U. S., at 18; accord, *id.,* at 15. As a consequence, we have looked to "history and experience, and the established order of things," *id.,* at 14, rather than "[a]dhering to the mere letter" of the Eleventh Amendment, *id.,* at 13, in determining the scope of the States' constitutional immunity from suit.

Following this approach, the Court has upheld States' assertions of sovereign immunity in various contexts falling outside the literal text of the Eleventh Amendment. In *Hans,* the Court held that sovereign immunity barred a citizen from suing his own State under the federal-question head of jurisdiction. The Court was unmoved by the petitioner's argument that the Eleventh Amendment, by its

terms, applied only to suits brought by citizens of other States:

> "It seems to us that these views of those great advocates and defenders of the Constitution were most sensible and just; and they apply equally to the present case as to that then under discussion. The letter is appealed to now, as it was then, as a ground for sustaining a suit brought by an individual against a State. The reason against it is as strong in this case as it was in that. It is an attempt to strain the Constitution and the law to a construction never imagined or dreamed of." *Id.*, at 14–15.

Later decisions rejected similar requests to conform the principle of sovereign immunity to the strict language of the Eleventh Amendment in holding that nonconsenting States are immune from suits brought by federal corporations, *Smith* v. *Reeves*, 178 U. S. 436 (1900), foreign nations, *Principality of Monaco, supra*, or Indian tribes, *Blatchford* v. *Native Village of Noatak*, 501 U. S. 775 (1991), and in concluding that sovereign immunity is a defense to suits in admiralty, though the text of the Eleventh Amendment addresses only suits "in law or equity," *Ex parte New York*, 256 U. S. 490 (1921).

These holdings reflect a settled doctrinal understanding, consistent with the views of the leading advocates of the Constitution's ratification, that sovereign immunity derives not from the Eleventh Amendment but from the structure of the original Constitution itself. See, *e. g., Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U. S. 261, 267–268 (1997) (acknowledging "the broader concept of immunity, implicit in the Constitution, which we have regarded the Eleventh Amendment as evidencing and exemplifying"); *Seminole Tribe, supra*, at 55–56; *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 98–99 (1984); *Ex parte New York, supra*, at 497. The Eleventh Amendment confirmed, rather

than established, sovereign immunity as a constitutional principle; it follows that the scope of the States' immunity from suit is demarcated not by the text of the Amendment alone but by fundamental postulates implicit in the constitutional design. As we explained in *Principality of Monaco:*

> "Manifestly, we cannot rest with a mere literal application of the words of §2 of Article III, or assume that the letter of the Eleventh Amendment exhausts the restrictions upon suits against non-consenting States. Behind the words of the constitutional provisions are postulates which limit and control. There is the essential postulate that the controversies, as contemplated, shall be found to be of a justiciable character. There is also the postulate that States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention.'" 292 U. S., at 322–323 (quoting The Federalist No. 81 (footnote omitted).

Or, as we have more recently reaffirmed:

> "Although the text of the Amendment would appear to restrict only the Article III diversity jurisdiction of the federal courts, 'we have understood the Eleventh Amendment to stand not so much for what it says, but for the presupposition . . . which it confirms.' *Blatchford* v. *Native Village of Noatak,* 501 U. S. 775, 779 (1991). That presupposition, first observed over a century ago in *Hans* v. *Louisiana,* 134 U. S. 1 (1890), has two parts: first, that each State is a sovereign entity in our federal system; and second, that ' "[i]t is inherent in the nature of sovereignty not to be amenable to the suit of an individual without its consent," ' *id.,* at 13 (emphasis deleted), quoting The Federalist No. 81, p. 487 . . . ." *Seminole Tribe, supra,* at 54.

Accord, *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.*, 506 U. S. 139, 146 (1993) ("The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity").

## II

In this case we must determine whether Congress has the power, under Article I, to subject nonconsenting States to private suits in their own courts. As the foregoing discussion makes clear, the fact that the Eleventh Amendment by its terms limits only "[t]he Judicial power of the United States" does not resolve the question. To rest on the words of the Amendment alone would be to engage in the type of ahistorical literalism we have rejected in interpreting the scope of the States' sovereign immunity since the discredited decision in *Chisholm. Seminole Tribe*, 517 U. S., at 68; see also *id.*, at 69 (quoting *Principality of Monaco, supra*, at 326, in turn quoting *Hans*, 134 U. S., at 15) ("[W]e long have recognized that blind reliance upon the text of the Eleventh Amendment is '"to strain the Constitution and the law to a construction never imagined or dreamed of"'").

While the constitutional principle of sovereign immunity does pose a bar to federal jurisdiction over suits against nonconsenting States, see, *e. g.*, *Principality of Monaco*, 292 U. S., at 322–323, this is not the only structural basis of sovereign immunity implicit in the constitutional design. Rather, "[t]here is also the postulate that States of the Union, still possessing attributes of sovereignty, shall be immune from suits, without their consent, save where there has been 'a surrender of this immunity in the plan of the convention.'" *Ibid.* (quoting The Federalist No. 81; accord, *Blatchford, supra*, at 781; *Seminole Tribe, supra*, at 68. This separate and distinct structural principle is not directly related to the scope of the judicial power established by Article III, but inheres in the system of federalism established by the Constitution. In exercising its Article I powers Con-

gress may subject the States to private suits in their own courts only if there is "compelling evidence" that the States were required to surrender this power to Congress pursuant to the constitutional design. *Blatchford,* 501 U. S., at 781.

## A

Petitioners contend the text of the Constitution and our recent sovereign immunity decisions establish that the States were required to relinquish this portion of their sovereignty. We turn first to these sources.

### 1

Article I, § 8, grants, Congress broad power to enact legislation in several enumerated areas of national concern. The Supremacy Clause, furthermore, provides:

> "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . , shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U. S. Const., Art. VI.

It is contended that, by virtue of these provisions, where Congress enacts legislation subjecting the States to suit, the legislation by necessity overrides the sovereign immunity of the States.

As is evident from its text, however, the Supremacy Clause enshrines as "the supreme Law of the Land" only those Federal Acts that accord with the constitutional design. See *Printz,* 521 U. S., at 924. Appeal to the Supremacy Clause alone merely raises the question whether a law is a valid exercise of the national power. See The Federalist No. 33, at 204 (A. Hamilton) ("But it will not follow from this doctrine that acts of the larger society which are *not pursuant* to its constitutional powers, but which are invasions of the residuary authorities of the smaller societies, will become the supreme law of the land"); *Printz, supra,* at 924–925.

The Constitution, by delegating to Congress the power to establish the supreme law of the land when acting within its enumerated powers, does not foreclose a State from asserting immunity to claims arising under federal law merely because that law derives not from the State itself but from the national power. A contrary view could not be reconciled with *Hans, supra,* which sustained Louisiana's immunity in a private suit arising under the Constitution itself; with *Employees of Dept. of Public Health and Welfare of Mo.* v. *Department of Public Health and Welfare of Mo.,* 411 U. S. 279, 283 (1973), which recognized that the FLSA was binding upon Missouri but nevertheless upheld the State's immunity to a private suit to recover under that Act; or with numerous other decisions to the same effect. We reject any contention that substantive federal law by its own force necessarily overrides the sovereign immunity of the States. When a State asserts its immunity to suit, the question is not the primacy of federal law but the implementation of the law in a manner consistent with the constitutional sovereignty of the States.

Nor can we conclude that the specific Article I powers delegated to Congress necessarily include, by virtue of the Necessary and Proper Clause or otherwise, the incidental authority to subject the States to private suits as a means of achieving objectives otherwise within the scope of the enumerated powers. Although some of our decisions had endorsed this contention, see *Parden* v. *Terminal R. Co. of Ala. Docks Dept.,* 377 U. S. 184, 190–194 (1964); *Pennsylvania* v. *Union Gas Co.,* 491 U. S. 1, 13–23 (1989) (plurality opinion), they have since been overruled, see *Seminole Tribe, supra,* at 63–67, 72; *College Savings Bank* v. *Florida Prepaid Postsecondary Ed. Expense Bd., ante,* at 680. As we have recognized in an analogous context:

"When a 'La[w] . . . for carrying into Execution' the Commerce Clause violates the principle of state sovereignty reflected in the various constitutional

provisions . . . it is not a 'La[w] . . . *proper* for carrying into Execution the Commerce Clause,' and is thus, in the words of The Federalist, 'merely [an] ac[t] of usurpation' which 'deserve[s] to be treated as such.'" *Printz, supra,* at 923–924 (quoting The Federalist No. 33, at 204) (ellipses and alterations in *Printz*).

The cases we have cited, of course, came at last to the conclusion that neither the Supremacy Clause nor the enumerated powers of Congress confer authority to abrogate the States' immunity from suit in federal court. The logic of the decisions, however, does not turn on the forum in which the suits were prosecuted but extends to state-court suits as well.

The dissenting opinion seeks to reopen these precedents, contending that state sovereign immunity must derive either from the common law (in which case the dissent contends it is defeasible by statute) or from natural law (in which case the dissent believes it cannot bar a federal claim). See *post,* at 797–798. As should be obvious to all, this is a false dichotomy. The text and the structure of the Constitution protect various rights and principles. Many of these, such as the right to trial by jury and the prohibition on unreasonable searches and seizures, derive from the common law. The common-law lineage of these rights does not mean they are defeasible by statute or remain mere common-law rights, however. They are, rather, constitutional rights, and form the fundamental law of the land.

Although the sovereign immunity of the States derives at least in part from the common-law tradition, the structure and history of the Constitution make clear that the immunity exists today by constitutional design. The dissent has provided no persuasive evidence that the founding generation regarded the States' sovereign immunity as defeasible by federal statute. While the dissent implies this view was held by Madison and Marshall, see *post,* at 778, nothing in the comments made by either individual at the ratification

conventions states, or even implies, such an understanding. Although the dissent seizes upon Justice Iredell's statutory analysis in *Chisholm* in an attempt to attribute this view to Justice Iredell, see *post*, at 787–789, citing *Chisholm*, 2 Dall., at 449, Justice Iredell's views on the underlying constitutional question are clear enough from other portions of his dissenting opinion:

> "So much, however, has been said on the Constitution, that it may not be improper to intimate that my present opinion is strongly against any construction of it, which will admit, under any circumstances, a compulsive suit against a State for the recovery of money. I think every word in the Constitution may have its full effect without involving this consequence, and that nothing but express words, or an insurmountable implication (neither of which I consider, can be found in this case) would authorize the deduction of so high a power." *Id.*, at 449–450.

Despite the dissent's assertion to the contrary, the fact that a right is not defeasible by statute means only that it is protected by the Constitution, not that it derives from natural law. Whether the dissent's attribution of our reasoning and conclusions to natural law results from analytical confusion or rhetorical device, it is simply inaccurate. We do not contend the Founders could not have stripped the States of sovereign immunity and granted Congress power to subject them to private suit but only that they did not do so. By the same token, the contours of sovereign immunity are determined by the Founders' understanding, not by the principles or limitations derived from natural law.

The dissent has offered no evidence that the Founders believed sovereign immunity extended only to cases where the sovereign was the source of the right asserted. No such limitation existed on sovereign immunity in England, where sovereign immunity was predicated on a different theory al-

together. See 1 F. Pollock & F. Maitland, History of English Law 518 (2d ed. 1909), quoted in *Nevada* v. *Hall,* 440 U. S., at 415, n. 6 ("'[The King] can not be compelled to answer in his own court, but this is true of every petty lord of every petty manor'"); accord, 3 W. Holdsworth, A History of English Law 465 (3d ed. 1927) ("[N]o feudal lord could be sued in his own court"). It is doubtful whether the King was regarded, in any meaningful sense, as the font of the traditions and customs which formed the substance of the common law, yet he could not be sued on a common-law claim in his own courts. And it strains credibility to imagine that the King could have been sued in his own court on, say, a French cause of action.

In light of the ratification debates and the history of the Eleventh Amendment, there is no reason to believe the Founders intended the Constitution to preserve a more restricted immunity in the United States. On the contrary, Congress' refusal to modify the text of the Eleventh Amendment to create an exception to sovereign immunity for cases arising under treaties, see *supra,* at 721, suggests the States' sovereign immunity was understood to extend beyond state-law causes of action. And surely the dissent does not believe that sovereign immunity poses no bar to a state-law suit against the United States in federal court, or that the Federal Tort Claims Act effected a contraction, rather than an expansion, of the United States' amenability to suit.

2

There are isolated statements in some of our cases suggesting that the Eleventh Amendment is inapplicable in state courts. See *Hilton* v. *South Carolina Public Railways Comm'n,* 502 U. S. 197, 204–205 (1991); *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58, 63 (1989); *Atascadero State Hospital* v. *Scanlon,* 473 U. S., at 239–240, n. 2; *Maine* v. *Thiboutot,* 448 U. S. 1, 9, n. 7 (1980); *Hall, supra,* at 418–421. This, of course, is a truism as to the literal terms of

the Eleventh Amendment. As we have explained, however, the bare text of the Amendment is not an exhaustive description of the States' constitutional immunity from suit. The cases, furthermore, do not decide the question presented here—whether the States retain immunity from private suits in their own courts notwithstanding an attempted abrogation by the Congress.

Two of the cases discussing state-court immunity may be dismissed out of hand. The footnote digressions in *Atascadero State Hospital* and *Thiboutot* were irrelevant to either opinion's holding or rationale. The discussion in *Will* was also unnecessary to the decision; our holding that 42 U. S. C. § 1983 did not create a cause of action against the States rendered it unnecessary to determine the scope of the States' constitutional immunity from suit in their own courts. Our opinions in *Hilton* and *Hall*, however, require closer attention, for in those cases we sustained suits against States in state courts.

In *Hilton* we held that an injured employee of a state-owned railroad could sue his employer (an arm of the State) in state court under the Federal Employers' Liability Act (FELA), 53 Stat. 1404, 45 U. S. C. §§ 51–60. Our decision was "controlled and informed" by *stare decisis*. 502 U. S., at 201. A generation earlier we had held that because the FELA made clear that all who operated railroads would be subject to suit by injured workers, States that chose to enter the railroad business after the statute's enactment impliedly waived their sovereign immunity from such suits. See *Parden* v. *Terminal R. Co. of Ala. Docks Dept.*, 377 U. S. 184 (1964). Some States had excluded railroad workers from the coverage of their workers' compensation statutes on the assumption that the FELA provided adequate protection for those workers. *Hilton*, 502 U. S., at 202. Closing the courts to FELA suits against state employers would have dislodged settled expectations and required an extensive legislative response. *Ibid.*

There is language in *Hilton* which gives some support to the position of petitioners here but our decision did not squarely address, much less resolve, the question of Congress' power to abrogate States' immunity from suit in their own courts. The respondent in *Hilton*, the South Carolina Public Railways Commission, neither contested Congress' constitutional authority to subject it to suits for money damages nor raised sovereign immunity as an affirmative defense. See Brief for Respondent in No. 90–848, O. T. 1991, pp. 7, n. 14, 21. Nor was the State's litigation strategy surprising. *Hilton* was litigated and decided in the wake of *Union Gas,* and before this Court's decisions in *New York, Printz,* and *Seminole Tribe.* At that time it may have appeared to the State that Congress' power to abrogate its immunity from suit in any court was not limited by the Constitution at all, so long as Congress made its intent sufficiently clear.

Furthermore, our decision in *Parden* was based on concepts of waiver and consent. Although later decisions have undermined the basis of *Parden*'s reasoning, see, *e. g., Welch* v. *Texas Dept. of Highways and Public Transp.,* 483 U. S. 468, 476–478 (1987) (recognizing that *Parden* erred in finding a clear congressional intent to subject the States to suit); *College Savings Bank, ante,* at 680 (overruling *Parden*'s theory of constructive waiver), we have not questioned the general proposition that a State may waive its sovereign immunity and consent to suit, see *Seminole Tribe,* 517 U. S., at 65.

*Hilton,* then, must be read in light of the doctrinal basis of *Parden,* the issues presented and argued by the parties, and the substantial reliance interests drawn into question by the litigation. When so read, we believe the decision is best understood not as recognizing a congressional power to subject nonconsenting States to private suits in their own courts, nor even as endorsing the constructive waiver theory of *Parden,* but as simply adhering, as a matter of *stare decisis* and presumed historical fact, to the narrow proposition

that certain States had consented to be sued by injured workers covered by the FELA, at least in their own courts.

In *Hall* we considered whether California could subject Nevada to suit in California's courts and determined the Constitution did not bar it from doing so. We noted that "[t]he doctrine of sovereign immunity is an amalgam of two quite different concepts, one applicable to suits in the sovereign's own courts and the other to suits in the courts of another sovereign." 440 U. S., at 414. We acknowledged that "[t]he immunity of a truly independent sovereign from suit in its own courts has been enjoyed as a matter of absolute right for centuries. Only the sovereign's own consent could qualify the absolute character of that immunity," *ibid.*, that "the notion that immunity from suit is an attribute of sovereignty is reflected in our cases," *id.*, at 415, and that "[t]his explanation adequately supports the conclusion that no sovereign may be sued in its own courts without its consent," *id.*, at 416. We sharply distinguished, however, a sovereign's immunity from suit in the courts of another sovereign:

> "[B]ut [this explanation] affords no support for a claim of immunity in another sovereign's courts. Such a claim necessarily implicates the power and authority of a second sovereign; its source must be found either in an agreement, express or implied, between the two sovereigns, or in the voluntary decision of the second to respect the dignity of the first as a matter of comity." *Ibid.*

Since we determined the Constitution did not reflect an agreement between the States to respect the sovereign immunity of one another, California was free to determine whether it would respect Nevada's sovereignty as a matter of comity.

Our opinion in *Hall* did distinguish a State's immunity from suit in federal court from its immunity in the courts of

other States; it did not, however, address or consider any differences between a State's sovereign immunity in federal court and in its own courts. Our reluctance to find an implied constitutional limit on the power of the States cannot be construed, furthermore, to support an analogous reluctance to find implied constitutional limits on the power of the Federal Government. The Constitution, after all, treats the powers of the States differently from the powers of the Federal Government. As we explained in *Hall:*

> "[I]n view of the Tenth Amendment's reminder that powers not delegated to the Federal Government nor prohibited to the States are reserved to the States or to the people, the existence of express limitations on state sovereignty may equally imply that caution should be exercised before concluding that unstated limitations on state power were intended by the Framers." *Id.,* at 425 (footnote omitted).

The Federal Government, by contrast, "can claim no powers which are not granted to it by the constitution, and the powers actually granted must be such as are expressly given, or given by necessary implication." *Martin* v. *Hunter's Lessee,* 1 Wheat. 304, 326 (1816); see also *City of Boerne* v. *Flores,* 521 U. S. 507, 516 (1997); *United States* v. *Lopez,* 514 U. S. 549, 552 (1995).

Our decision in *Hall* thus does not support the argument urged by petitioners here. The decision addressed neither Congress' power to subject States to private suits nor the States' immunity from suit in their own courts. In fact, the distinction drawn between a sovereign's immunity in its own courts and its immunity in the courts of another sovereign, as well as the reasoning on which this distinction was based, are consistent with, and even support, the proposition urged by respondent here—that the Constitution reserves to the

States a constitutional immunity from private suits in their own courts which cannot be abrogated by Congress.

Petitioners seek support in two additional decisions. In *Reich* v. *Collins*, 513 U. S. 106 (1994), we held that, despite its immunity from suit in federal court, a State which holds out what plainly appears to be "a clear and certain" postdeprivation remedy for taxes collected in violation of federal law may not declare, after disputed taxes have been paid in reliance on this remedy, that the remedy does not in fact exist. *Id.*, at 108. This case arose in the context of tax-refund litigation, where a State may deprive a taxpayer of all other means of challenging the validity of its tax laws by holding out what appears to be a "clear and certain" postdeprivation remedy. *Ibid.;* see also *Fair Assessment in Real Estate Assn., Inc.* v. *McNary*, 454 U. S. 100 (1981). In this context, due process requires the State to provide the remedy it has promised. Cf. *Hudson* v. *Palmer*, 468 U. S. 517, 539 (1984) (O'CONNOR, J., concurring). The obligation arises from the Constitution itself; *Reich* does not speak to the power of Congress to subject States to suits in their own courts.

In *Howlett* v. *Rose*, 496 U. S. 356 (1990), we held that a state court could not refuse to hear a § 1983 suit against a school board on the basis of sovereign immunity. The school board was not an arm of the State, however, so it could not assert any constitutional defense of sovereign immunity to which the State would have been entitled. See *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 280 (1977). In *Howlett*, then, the only question was "whether a state-law defense of 'sovereign immunity' is available to a school board otherwise subject to suit in a Florida court even though such a defense would not be available if the action had been brought in a federal forum." 496 U. S., at 358–359. The decision did not address the question of Congress' power to compel a state court to entertain an action against a nonconsenting State.

B

Whether Congress has authority under Article I to abrogate a State's immunity from suit in its own courts is, then, a question of first impression. In determining whether there is "compelling evidence" that this derogation of the States' sovereignty is "inherent in the constitutional compact," *Blatchford*, 501 U. S., at 781, we continue our discussion of history, practice, precedent, and the structure of the Constitution.

1

We look first to evidence of the original understanding of the Constitution. Petitioners contend that because the ratification debates and the events surrounding the adoption of the Eleventh Amendment focused on the States' immunity from suit in federal courts, the historical record gives no instruction as to the founding generation's intent to preserve the States' immunity from suit in their own courts.

We believe, however, that the Founders' silence is best explained by the simple fact that no one, not even the Constitution's most ardent opponents, suggested the document might strip the States of the immunity. In light of the overriding concern regarding the States' war-time debts, together with the well-known creativity, foresight, and vivid imagination of the Constitution's opponents, the silence is most instructive. It suggests the sovereign's right to assert immunity from suit in its own courts was a principle so well established that no one conceived it would be altered by the new Constitution.

The arguments raised against the Constitution confirm this strong inference. In England, the rule was well established that "no lord could be sued by a vassal in his own court, but each petty lord was subject to suit in the courts of a higher lord." *Hall*, 440 U. S., at 414–415. It was argued that, by analogy, the States could be sued without consent in federal court. *Id.*, at 418. The point of the argu-

ment was that federal jurisdiction under Article III would circumvent the States' immunity from suit in their own courts. The argument would have made little sense if the States were understood to have relinquished the immunity in all events.

The response the Constitution's advocates gave to the argument is also telling. Relying on custom and practice—and, in particular, on the States' immunity from suit in their own courts, see 3 Elliot's Debates 555 (remarks of J. Marshall)—they contended that no individual could sue a sovereign without its consent. It is true the point was directed toward the power of the Federal Judiciary, for that was the only question at issue. The logic of the argument, however, applies with even greater force in the context of a suit prosecuted against a sovereign in its own courts, for in this setting, more than any other, sovereign immunity was long established and unquestioned. See *Hall, supra,* at 414.

Similarly, while the Eleventh Amendment by its terms addresses only "the Judicial power of the United States," nothing in *Chisholm,* the catalyst for the Amendment, suggested the States were not immune from suits in their own courts. The only Justice to address the issue, in fact, was explicit in distinguishing between sovereign immunity in federal court and in a State's own courts. See 2 Dall., at 452 (opinion of Blair, J.) ("When sovereigns are sued in their own Courts, such a method [a petition of right] may have been established as the most respectful form of demand; but we are not now in a State-Court; and if sovereignty be an exemption from suit in any other than the sovereign's own Courts, it follows that when a State, by adopting the Constitution, has agreed to be amenable to the judicial power of the *United States,* she has, in that respect, given up her right of sovereignty").

The language of the Eleventh Amendment, furthermore, was directed toward the only provisions of the constitutional text believed to call the States' immunity from private suits into question. Although Article III expressly contemplated

jurisdiction over suits between States and individuals, nothing in the Article or in any other part of the Constitution suggested the States could not assert immunity from private suit in their own courts or that Congress had the power to abrogate sovereign immunity there.

Finally, the Congress which endorsed the Eleventh Amendment rejected language limiting the Amendment's scope to cases where the States had made available a remedy in their own courts. See *supra*, at 721. Implicit in the proposal, it is evident, was the premise that the States retained their immunity and the concomitant authority to decide whether to allow private suits against the sovereign in their own courts.

In light of the language of the Constitution and the historical context, it is quite apparent why neither the ratification debates nor the language of the Eleventh Amendment addressed the States' immunity from suit in their own courts. The concerns voiced at the ratifying conventions, the furor raised by *Chisholm*, and the speed and unanimity with which the Amendment was adopted, moreover, underscore the jealous care with which the founding generation sought to preserve the sovereign immunity of the States. To read this history as permitting the inference that the Constitution stripped the States of immunity in their own courts and allowed Congress to subject them to suit there would turn on its head the concern of the founding generation—that Article III might be used to circumvent state-court immunity. In light of the historical record it is difficult to conceive that the Constitution would have been adopted if it had been understood to strip the States of immunity from suit in their own courts and cede to the Federal Government a power to subject nonconsenting States to private suits in these fora.

2

Our historical analysis is supported by early congressional practice, which provides "contemporaneous and weighty evi-

dence of the Constitution's meaning." *Printz*, 521 U. S., at 905 (internal quotation marks omitted). Although early Congresses enacted various statutes authorizing federal suits in state court, see *id.*, at 906–907 (listing statutes); *Testa* v. *Katt*, 330 U. S. 386, 389–390 (1947), we have discovered no instance in which they purported to authorize suits against nonconsenting States in these fora. The "numerousness of these statutes [authorizing suit in state court], contrasted with the utter lack of statutes" subjecting States to suit, "suggests an assumed *absence* of such power." 521 U. S., at 907–908. It thus appears early Congresses did not believe they had the power to authorize private suits against the States in their own courts.

Not only were statutes purporting to authorize private suits against nonconsenting States in state courts not enacted by early Congresses; statutes purporting to authorize such suits in any forum are all but absent from our historical experience. The first statute we confronted that even arguably purported to subject the States to private actions was the FELA. See *Parden*, 377 U. S., at 187 ("Here, for the first time in this Court, a State's claim of immunity against suit by an individual meets a suit brought upon a cause of action expressly created by Congress"). As we later recognized, however, even this statute did not clearly create a cause of action against the States. See *Welch*, 483 U. S., at 476–478. The provisions of the FLSA at issue here, which were enacted in the aftermath of *Parden*, are among the first statutory enactments purporting in express terms to subject nonconsenting States to private suits. Although similar statutes have multiplied in the last generation, "they are of such recent vintage that they are no more probative than the [FLSA] of a constitutional tradition that lends meaning to the text. Their persuasive force is far outweighed by almost two centuries of apparent congressional avoidance of the practice." *Printz, supra*, at 918.

Even the recent statutes, moreover, do not provide evidence of an understanding that Congress has a greater power to subject States to suit in their own courts than in federal courts. On the contrary, the statutes purport to create causes of actions against the States which are enforceable in federal, as well as state, court. To the extent recent practice thus departs from longstanding tradition, it reflects not so much an understanding that the States have surrendered their immunity from suit in their own courts as the erroneous view, perhaps inspired by *Parden* and *Union Gas*, that Congress may subject nonconsenting States to private suits in any forum.

3

The theory and reasoning of our earlier cases suggest the States do retain a constitutional immunity from suit in their own courts. We have often described the States' immunity in sweeping terms, without reference to whether the suit was prosecuted in state or federal court. See, *e. g., Briscoe* v. *Bank of Kentucky*, 11 Pet. 257, 321–322 (1837) ("No sovereign state is liable to be sued without her consent"); *Board of Liquidation* v. *McComb*, 92 U. S. 531, 541 (1876) ("A State, without its consent, cannot be sued by an individual"); *In re Ayers*, 123 U. S. 443, 506 (1887) (same); *Great Northern Life Ins. Co.* v. *Read*, 322 U. S. 47, 51 (1944) ("The inherent nature of sovereignty prevents actions against a state by its own citizens without its consent").

We have said on many occasions, furthermore, that the States retain their immunity from private suits prosecuted in their own courts. See, *e. g., Beers* v. *Arkansas*, 20 How. 527, 529 (1858) ("It is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission"); *Railroad Co.* v. *Tennessee*, 101 U. S. 337, 339 (1880) ("The principle is elementary that a State cannot be sued in its own courts without its consent. This is a privilege of sovereignty"); *Cunningham* v. *Macon & Brunswick*

*R. Co.,* 109 U. S. 446, 451 (1883) ("It may be accepted as a point of departure unquestioned, that neither a State nor the United States can be sued as defendant in any court in this country without their consent, except in the limited class of cases in which a State may be made a party in the Supreme Court of the United States by virtue of the original jurisdiction conferred on this court by the Constitution"); *Louisiana ex rel. New York Guaranty & Indemnity Co.* v. *Steele,* 134 U. S. 230, 232 (1890) (finding a suit against a state official in state court to be "clearly within the principle" of the Eleventh Amendment decisions); *Hess* v. *Port Authority Trans-Hudson Corporation,* 513 U. S. 30, 39 (1994) ("The Eleventh Amendment largely shields States from suit in federal court without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals"); *Seminole Tribe,* 517 U. S., at 71, n. 14 ("[T]his Court is empowered to review a question of federal law arising from a state-court decision where a State has consented to suit"); see also *Great Northern Life Ins. Co.* v. *Read,* 322 U. S., at 59 (Frankfurter, J., dissenting) ("The Eleventh Amendment has put state immunity from suit into the Constitution. Therefore, it is not in the power of individuals to bring any State into court—the State's or that of the United States—except with its consent"); accord, *id.,* at 51, 53 (majority opinion); cf. *Quern* v. *Jordan,* 440 U. S. 332, 340 (1979); *Green* v. *Mansour,* 474 U. S. 64, 71 (1985).

We have also relied on the States' immunity in their own courts as a premise in our Eleventh Amendment rulings. See *Hans,* 134 U. S., at 10 ("It is true the amendment does so read, and, if there were no other reason or ground for abating his suit, it might be maintainable; and then we should have this anomalous result [that a State may be sued by its own citizen though not by the citizen of another State, and that a State] may be thus sued in the federal courts, although not allowing itself to be sued in its own courts. If this is the necessary consequence of the language of the Con-

stitution and the law, the result is no less startling and unexpected than *[Chisholm]");* *id.,* at 18 ("The state courts have no power to entertain suits by individuals against a State without its consent. Then how does the Circuit Court, having only concurrent jurisdiction, acquire any such power?").

In particular, the exception to our sovereign immunity doctrine recognized in *Ex parte Young,* 209 U. S. 123 (1908), is based in part on the premise that sovereign immunity bars relief against States and their officers in both state and federal courts, and that certain suits for declaratory or injunctive relief against state officers must therefore be permitted if the Constitution is to remain the supreme law of the land. As we explained in *General Oil Co.* v. *Crain,* 209 U. S. 211 (1908), a case decided the same day as *Ex parte Young* and extending the rule of that case to state-court suits:

> "It seems to be an obvious consequence that as a State can only perform its functions through its officers, a restraint upon them is a restraint upon its sovereignty from which it is exempt without its consent in the state tribunals, and exempt by the Eleventh Amendment of the Constitution of the United States, in the national tribunals. The error is in the universality of the conclusion, as we have seen. Necessarily to give adequate protection to constitutional rights a distinction must be made between valid and invalid state laws, as determining the character of the suit against state officers. And the suit at bar illustrates the necessity. If a suit against state officers is precluded in the national courts by the Eleventh Amendment to the Constitution, and may be forbidden by a State to its courts, as it is contended in the case at bar that it may be, without power of review by this court, it must be evident that an easy way is open to prevent the enforcement of many provisions of the Constitution . . . . See *Ex parte Young,* [209 U. S., at] 123, where this subject is fully discussed and the cases reviewed." 209 U. S., at 226–227.

Had we not understood the States to retain a constitutional immunity from suit in their own courts, the need for the *Ex parte Young* rule would have been less pressing, and the rule would not have formed so essential a part of our sovereign immunity doctrine. See *Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U. S., at 270–271 (principal opinion).

As it is settled doctrine that neither substantive federal law nor attempted congressional abrogation under Article I bars a State from raising a constitutional defense of sovereign immunity in federal court, see Part II–A–1, *supra*, our decisions suggesting that the States retain an analogous constitutional immunity from private suits in their own courts support the conclusion that Congress lacks the Article I power to subject the States to private suits in those fora.

### 4

Our final consideration is whether a congressional power to subject nonconsenting States to private suits in their own courts is consistent with the structure of the Constitution. We look both to the essential principles of federalism and to the special role of the state courts in the constitutional design.

Although the Constitution grants broad powers to Congress, our federalism requires that Congress treat the States in a manner consistent with their status as residuary sovereigns and joint participants in the governance of the Nation. See, *e. g.*, *United States* v. *Lopez*, 514 U. S., at 583 (KENNEDY, J., concurring); *Printz*, 521 U. S., at 935; *New York*, 505 U. S., at 188. The founding generation thought it "neither becoming nor convenient that the several States of the Union, invested with that large residuum of sovereignty which had not been delegated to the United States, should be summoned as defendants to answer the complaints of private persons." *In re Ayers*, 123 U. S., at 505. The principle of sovereign immunity preserved by constitutional design "thus accords the States the respect owed them as members

of the federation." *Puerto Rico Aqueduct and Sewer Authority*, 506 U. S., at 146; accord, *Coeur d'Alene Tribe, supra*, at 268 (recognizing "the dignity and respect afforded a State, which the immunity is designed to protect").

Petitioners contend that immunity from suit in federal court suffices to preserve the dignity of the States. Private suits against nonconsenting States, however, present "the indignity of subjecting a State to the coercive process of judicial tribunals at the instance of private parties," *In re Ayers, supra*, at 505; accord, *Seminole Tribe*, 517 U. S., at 58, regardless of the forum. Not only must a State defend or default but also it must face the prospect of being thrust, by federal fiat and against its will, into the disfavored status of a debtor, subject to the power of private citizens to levy on its treasury or perhaps even government buildings or property which the State administers on the public's behalf.

In some ways, of course, a congressional power to authorize private suits against nonconsenting States in their own courts would be even more offensive to state sovereignty than a power to authorize the suits in a federal forum. Although the immunity of one sovereign in the courts of another has often depended in part on comity or agreement, the immunity of a sovereign in its own courts has always been understood to be within the sole control of the sovereign itself. See generally *Hall*, 440 U. S., at 414–418. A power to press a State's own courts into federal service to coerce the other branches of the State, furthermore, is the power first to turn the State against itself and ultimately to commandeer the entire political machinery of the State against its will and at the behest of individuals. Cf. *Coeur d'Alene Tribe, supra*, at 276. Such plenary federal control of state governmental processes denigrates the separate sovereignty of the States.

It is unquestioned that the Federal Government retains its own immunity from suit not only in state tribunals but also in its own courts. In light of our constitutional system

recognizing the essential sovereignty of the States, we are reluctant to conclude that the States are not entitled to a reciprocal privilege.

Underlying constitutional form are considerations of great substance. Private suits against nonconsenting States—especially suits for money damages—may threaten the financial integrity of the States. It is indisputable that, at the time of the founding, many of the States could have been forced into insolvency but for their immunity from private suits for money damages. Even today, an unlimited congressional power to authorize suits in state court to levy upon the treasuries of the States for compensatory damages, attorney's fees, and even punitive damages could create staggering burdens, giving Congress a power and a leverage over the States that is not contemplated by our constitutional design. The potential national power would pose a severe and notorious danger to the States and their resources.

A congressional power to strip the States of their immunity from private suits in their own courts would pose more subtle risks as well. "The principle of immunity from litigation assures the states and the nation from unanticipated intervention in the processes of government." *Great Northern Life Ins. Co.* v. *Read,* 322 U. S., at 53. When the States' immunity from private suits is disregarded, "the course of their public policy and the administration of their public affairs" may become "subject to and controlled by the mandates of judicial tribunals without their consent, and in favor of individual interests." *In re Ayers, supra,* at 505. While the States have relinquished their immunity from suit in some special contexts—at least as a practical matter—see Part III, *infra,* this surrender carries with it substantial costs to the autonomy, the decisionmaking ability, and the sovereign capacity of the States.

A general federal power to authorize private suits for money damages would place unwarranted strain on the

States' ability to govern in accordance with the will of their citizens. Today, as at the time of the founding, the allocation of scarce resources among competing needs and interests lies at the heart of the political process. While the judgment creditor of a State may have a legitimate claim for compensation, other important needs and worthwhile ends compete for access to the public fisc. Since all cannot be satisfied in full, it is inevitable that difficult decisions involving the most sensitive and political of judgments must be made. If the principle of representative government is to be preserved to the States, the balance between competing interests must be reached after deliberation by the political process established by the citizens of the State, not by judicial decree mandated by the Federal Government and invoked by the private citizen. "It needs no argument to show that the political power cannot be thus ousted of its jurisdiction and the judiciary set in its place." *Louisiana* v. *Jumel,* 107 U. S. 711, 727–728 (1883).

By "'split[ting] the atom of sovereignty,'" the Founders established "'two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain it and are governed by it.'" *Saenz* v. *Roe,* 526 U. S. 489, 504, n. 17 (1999), quoting *U. S. Term Limits, Inc.* v. *Thornton,* 514 U. S. 779, 838 (1995) (KENNEDY, J., concurring). "The Constitution thus contemplates that a State's government will represent and remain accountable to its own citizens." *Printz,* 521 U. S., at 920. When the Federal Government asserts authority over a State's most fundamental political processes, it strikes at the heart of the political accountability so essential to our liberty and republican form of government.

The asserted authority would blur not only the distinct responsibilities of the State and National Governments but also the separate duties of the judicial and political branches of the state governments, displacing "state decisions that 'go to the heart of representative government.'" *Gregory* v.

*Ashcroft*, 501 U. S. 452, 461 (1991). A State is entitled to order the processes of its own governance, assigning to the political branches, rather than the courts, the responsibility for directing the payment of debts. See *id.*, at 460 ("Through the structure of its government, and the character of those who exercise government authority, a State defines itself as a sovereign"). If Congress could displace a State's allocation of governmental power and responsibility, the judicial branch of the State, whose legitimacy derives from fidelity to the law, would be compelled to assume a role not only foreign to its experience but beyond its competence as defined by the very Constitution from which its existence derives.

Congress cannot abrogate the States' sovereign immunity in federal court; were the rule to be different here, the National Government would wield greater power in the state courts than in its own judicial instrumentalities. Cf. *Howlett*, 496 U. S., at 365 (noting the anomaly that would arise if "a State might be forced to entertain in its own courts suits from which it was immune in federal court"); *Hilton*, 502 U. S., at 206 (recognizing the "federalism-related concerns that arise when the National Government uses the state courts as the exclusive forum to permit recovery under a congressional statute").

The resulting anomaly cannot be explained by reference to the special role of the state courts in the constitutional design. Although Congress may not require the legislative or executive branches of the States to enact or administer federal regulatory programs, see *Printz, supra*, at 935; *New York*, 505 U. S., at 188, it may require state courts of "adequate and appropriate" jurisdiction, *Testa*, 330 U. S., at 394, "to enforce federal prescriptions, insofar as those prescriptions relat[e] to matters appropriate for the judicial power," *Printz, supra*, at 907. It would be an unprecedented step, however, to infer from the fact that Congress may declare federal law binding and enforceable in state courts the fur-

ther principle that Congress' authority to pursue federal objectives through the state judiciaries exceeds not only its power to press other branches of the State into its service but even its control over the federal courts themselves. The conclusion would imply that Congress may in some cases act only through instrumentalities of the States. Yet, as Chief Justice Marshall explained: "No trace is to be found in the constitution of an intention to create a dependence of the government of the Union on those of the States, for the execution of the great powers assigned to it. Its means are adequate to its ends; and on those means alone was it expected to rely for the accomplishment of its ends." *McCulloch* v. *Maryland,* 4 Wheat. 316, 424 (1819); cf. *Osborn* v. *Bank of United States,* 9 Wheat. 738, 821 (1824) ("It is not insinuated that the judicial power, in cases depending on the character of the cause, cannot be exercised in the first instance, in the Courts of the Union, but must first be exercised in the tribunals of the State").

The provisions of the Constitution upon which we have relied in finding the state courts peculiarly amenable to federal command, moreover, do not distinguish those courts from the Federal Judiciary. The Supremacy Clause does impose specific obligations on state judges. There can be no serious contention, however, that the Supremacy Clause imposes greater obligations on state-court judges than on the Judiciary of the United States itself. The text of Article III, § 1, which extends federal judicial power to enumerated classes of suits but grants Congress discretion whether to establish inferior federal courts, does give strong support to the inference that state courts may be opened to suits falling within the federal judicial power. The Article in no way suggests, however, that state courts may be required to assume jurisdiction that could not be vested in the federal courts and forms no part of the judicial power of the United States.

754

We have recognized that Congress may require state courts to hear only "matters appropriate for the judicial power," *Printz*, 521 U. S., at 907. Our sovereign immunity precedents establish that suits against nonconsenting States are not "properly susceptible of litigation in courts," *Hans*, 134 U. S., at 12, and, as a result, that "[t]he 'entire judicial power granted by the Constitution' does not embrace authority to entertain such suits in the absence of the State's consent," *Principality of Monaco*, 292 U. S., at 329 (quoting *Ex parte New York*, 256 U. S., at 497); accord, 292 U. S., at 322–323 (private suits against nonconsenting sovereigns are not "of a justiciable character"). We are aware of no constitutional precept that would admit of a congressional power to require state courts to entertain federal suits which are not within the judicial power of the United States and could not be heard in federal courts. As we explained in *Erie R. Co.* v. *Tompkins*, 304 U. S. 64 (1938):

> "[T]he Constitution of the United States . . . recognizes and preserves the autonomy and independence of the States—independence in their legislative and independence in their judicial departments. Supervision over either the legislative or the judicial action of the States is in no case permissible except as to matters by the Constitution specifically authorized or delegated to the United States. Any interference with either, except as thus permitted, is an invasion of the authority of the State and, to that extent, a denial of its independence." *Id.*, at 78–79.

In light of history, practice, precedent, and the structure of the Constitution, we hold that the States retain immunity from private suit in their own courts, an immunity beyond the congressional power to abrogate by Article I legislation.

### III

The constitutional privilege of a State to assert its sovereign immunity in its own courts does not confer upon the

State a concomitant right to disregard the Constitution or valid federal law. The States and their officers are bound by obligations imposed by the Constitution and by federal statutes that comport with the constitutional design. We are unwilling to assume the States will refuse to honor the Constitution or obey the binding laws of the United States. The good faith of the States thus provides an important assurance that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land." U. S. Const., Art. VI.

Sovereign immunity, moreover, does not bar all judicial review of state compliance with the Constitution and valid federal law. Rather, certain limits are implicit in the constitutional principle of state sovereign immunity.

The first of these limits is that sovereign immunity bars suits only in the absence of consent. Many States, on their own initiative, have enacted statutes consenting to a wide variety of suits. The rigors of sovereign immunity are thus "mitigated by a sense of justice which has continually expanded by consent the suability of the sovereign." *Great Northern Life Ins. Co.* v. *Read,* 322 U. S., at 53. Nor, subject to constitutional limitations, does the Federal Government lack the authority or means to seek the States' voluntary consent to private suits. Cf. *South Dakota* v. *Dole,* 483 U. S. 203 (1987).

The States have consented, moreover, to some suits pursuant to the plan of the Convention or to subsequent constitutional Amendments. In ratifying the Constitution, the States consented to suits brought by other States or by the Federal Government. *Principality of Monaco, supra,* at 328–329 (collecting cases). A suit which is commenced and prosecuted against a State in the name of the United States by those who are entrusted with the constitutional duty to "take Care that the Laws be faithfully executed," U. S. Const., Art. II, § 3, differs in kind from the suit of an individual: While the Constitution contemplates suits among the

members of the federal system as an alternative to extralegal measures, the fear of private suits against nonconsenting States was the central reason given by the Founders who chose to preserve the States' sovereign immunity. Suits brought by the United States itself require the exercise of political responsibility for each suit prosecuted against a State, a control which is absent from a broad delegation to private persons to sue nonconsenting States.

We have held also that in adopting the Fourteenth Amendment, the people required the States to surrender a portion of the sovereignty that had been preserved to them by the original Constitution, so that Congress may authorize private suits against nonconsenting States pursuant to its § 5 enforcement power. *Fitzpatrick* v. *Bitzer,* 427 U. S. 445 (1976). By imposing explicit limits on the powers of the States and granting Congress the power to enforce them, the Amendment "fundamentally altered the balance of state and federal power struck by the Constitution." *Seminole Tribe,* 517 U. S., at 59. When Congress enacts appropriate legislation to enforce this Amendment, see *City of Boerne* v. *Flores,* 521 U. S. 507 (1997), federal interests are paramount, and Congress may assert an authority over the States which would be otherwise unauthorized by the Constitution. *Fitzpatrick, supra,* at 456.

The second important limit to the principle of sovereign immunity is that it bars suits against States but not lesser entities. The immunity does not extend to suits prosecuted against a municipal corporation or other governmental entity which is not an arm of the State. See, *e. g., Mt. Healthy City Bd. of Ed.* v. *Doyle,* 429 U. S., at 280; *Lincoln County* v. *Luning,* 133 U. S. 529 (1890). Nor does sovereign immunity bar all suits against state officers. Some suits against state officers are barred by the rule that sovereign immunity is not limited to suits which name the State as a party if the suits are, in fact, against the State. See, *e. g., In re Ayers,* 123 U. S., at 505–506; *Idaho* v. *Coeur d'Alene Tribe of Idaho,*

521 U. S., at 270 ("The real interests served by the Eleventh Amendment are not to be sacrificed to elementary mechanics of captions and pleading"). The rule, however, does not bar certain actions against state officers for injunctive or declaratory relief. Compare *Ex parte Young*, 209 U. S. 123 (1908), and *In re Ayers, supra,* with *Coeur d'Alene Tribe of Idaho, supra, Seminole Tribe, supra,* and *Edelman* v. *Jordan,* 415 U. S. 651 (1974). Even a suit for money damages may be prosecuted against a state officer in his individual capacity for unconstitutional or wrongful conduct fairly attributable to the officer himself, so long as the relief is sought not from the state treasury but from the officer personally. *Scheuer* v. *Rhodes,* 416 U. S. 232, 237–238 (1974); *Ford Motor Co.* v. *Department of Treasury of Ind.,* 323 U. S. 459, 462 (1945).

The principle of sovereign immunity as reflected in our jurisprudence strikes the proper balance between the supremacy of federal law and the separate sovereignty of the States. See *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S., at 105. Established rules provide ample means to correct ongoing violations of law and to vindicate the interests which animate the Supremacy Clause. See *Green* v. *Mansour,* 474 U. S., at 68. That we have, during the first 210 years of our constitutional history, found it unnecessary to decide the question presented here suggests a federal power to subject nonconsenting States to private suits in their own courts is unnecessary to uphold the Constitution and valid federal statutes as the supreme law.

## IV

The sole remaining question is whether Maine has waived its immunity. The State of Maine "regards the immunity from suit as 'one of the highest attributes inherent in the nature of sovereignty,'" *Cushing* v. *Cohen,* 420 A. 2d 919, 923 (Me. 1981) (quoting *Drake* v. *Smith,* 390 A. 2d 541, 543 (Me. 1978)), and adheres to the general rule that "a specific authority conferred by an enactment of the legislature is req-

uisite if the sovereign is to be taken as having shed the protective mantle of immunity," 420 A. 2d, at 923. Petitioners have not attempted to establish a waiver of immunity under this standard. Although petitioners contend the State has discriminated against federal rights by claiming sovereign immunity from this FLSA suit, there is no evidence that the State has manipulated its immunity in a systematic fashion to discriminate against federal causes of action. To the extent Maine has chosen to consent to certain classes of suits while maintaining its immunity from others, it has done no more than exercise a privilege of sovereignty concomitant to its constitutional immunity from suit. The State, we conclude, has not consented to suit.

## V

This case at one level concerns the formal structure of federalism, but in a Constitution as resilient as ours form mirrors substance. Congress has vast power but not all power. When Congress legislates in matters affecting the States, it may not treat these sovereign entities as mere prefectures or corporations. Congress must accord States the esteem due to them as joint participants in a federal system, one beginning with the premise of sovereignty in both the central Government and the separate States. Congress has ample means to ensure compliance with valid federal laws, but it must respect the sovereignty of the States.

In an apparent attempt to disparage a conclusion with which it disagrees, the dissent attributes our reasoning to natural law. We seek to discover, however, only what the Framers and those who ratified the Constitution sought to accomplish when they created a federal system. We appeal to no higher authority than the Charter which they wrote and adopted. Theirs was the unique insight that freedom is enhanced by the creation of two governments, not one. We need not attach a label to our dissenting colleagues' insistence that the constitutional structure adopted by the Found-

ers must yield to the politics of the moment. Although the Constitution begins with the principle that sovereignty rests with the people, it does not follow that the National Government becomes the ultimate, preferred mechanism for expressing the people's will. The States exist as a refutation of that concept. In choosing to ordain and establish the Constitution, the people insisted upon a federal structure for the very purpose of rejecting the idea that the will of the people in all instances is expressed by the central power, the one most remote from their control. The Framers of the Constitution did not share our dissenting colleagues' belief that the Congress may circumvent the federal design by regulating the States directly when it pleases to do so, including by a proxy in which individual citizens are authorized to levy upon the state treasuries absent the States' consent to jurisdiction.

The case before us depends upon these principles. The State of Maine has not questioned Congress' power to prescribe substantive rules of federal law to which it must comply. Despite an initial good-faith disagreement about the requirements of the FLSA, it is conceded by all that the State has altered its conduct so that its compliance with federal law cannot now be questioned. The Solicitor General of the United States has appeared before this Court, however, and asserted that the federal interest in compensating the States' employees for alleged past violations of federal law is so compelling that the sovereign State of Maine must be stripped of its immunity and subjected to suit in its own courts by its own employees. Yet, despite specific statutory authorization, see 29 U. S. C. § 216(c), the United States apparently found the same interests insufficient to justify sending even a single attorney to Maine to prosecute this litigation. The difference between a suit by the United States on behalf of the employees and a suit by the employees implicates a rule that the National Government must itself deem the case of sufficient importance to take action against the

State; and history, precedent, and the structure of the Constitution make clear that, under the plan of the Convention, the States have consented to suits of the first kind but not of the second. The judgment of the Supreme Judicial Court of Maine is

*Affirmed.*

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

In *Seminole Tribe of Fla.* v. *Florida,* 517 U. S. 44 (1996), a majority of this Court invoked the Eleventh Amendment to declare that the federal judicial power under Article III of the Constitution does not reach a private action against a State, even on a federal question. In the Court's conception, however, the Eleventh Amendment was understood as having been enhanced by a "background principle" of state sovereign immunity (understood as immunity to suit), see *id.,* at 72, that operated beyond its limited codification in the Amendment, dealing solely with federal citizen-state diversity jurisdiction. To the *Seminole Tribe* dissenters, of whom I was one, the Court's enhancement of the Amendment was at odds with constitutional history and at war with the conception of divided sovereignty that is the essence of American federalism.

Today's issue arises naturally in the aftermath of the decision in *Seminole Tribe.* The Court holds that the Constitution bars an individual suit against a State to enforce a federal statutory right under the Fair Labor Standards Act of 1938 (FLSA), 29 U. S. C. § 201 *et seq.* (1994 ed. and Supp. III), when brought in the State's courts over its objection. In thus complementing its earlier decision, the Court of course confronts the fact that the state forum renders the Eleventh Amendment beside the point, and it has responded by discerning a simpler and more straightforward theory of state sovereign immunity than it found in *Seminole Tribe:* a State's sovereign immunity from all individual suits is a "fun-

damental aspect" of state sovereignty "confirm[ed]" by the Tenth Amendment. *Ante,* at 713, 714. As a consequence, *Seminole Tribe*'s contorted reliance on the Eleventh Amendment and its background was presumably unnecessary; the Tenth would have done the work with an economy that the majority in *Seminole Tribe* would have welcomed. Indeed, if the Court's current reasoning is correct, the Eleventh Amendment itself was unnecessary. Whatever Article III may originally have said about the federal judicial power, the embarrassment to the State of Georgia occasioned by attempts in federal court to enforce the State's war debt could easily have been avoided if only the Court that decided *Chisholm* v. *Georgia,* 2 Dall. 419 (1793), had understood a State's inherent, Tenth Amendment right to be free of any judicial power, whether the court be state or federal, and whether the cause of action arise under state or federal law.

The sequence of the Court's positions prompts a suspicion of error, and skepticism is confirmed by scrutiny of the Court's efforts to justify its holding. There is no evidence that the Tenth Amendment constitutionalized a concept of sovereign immunity as inherent in the notion of statehood, and no evidence that any concept of inherent sovereign immunity was understood historically to apply when the sovereign sued was not the font of the law. Nor does the Court fare any better with its subsidiary lines of reasoning, that the state-court action is barred by the scheme of American federalism, a result supposedly confirmed by a history largely devoid of precursors to the action considered here. The Court's federalism ignores the accepted authority of Congress to bind States under the FLSA and to provide for enforcement of federal rights in state court. The Court's history simply disparages the capacity of the Constitution to order relationships in a Republic that has changed since the founding.

On each point the Court has raised it is mistaken, and I respectfully dissent from its judgment.

762

## I

The Court rests its decision principally on the claim that immunity from suit was "a fundamental aspect of the sovereignty which the States enjoyed before the ratification of the Constitution," *ante,* at 713, an aspect which the Court understands to have survived the ratification of the Constitution in 1788 and to have been "confirm[ed]" and given constitutional status, *ante,* at 714, by the adoption of the Tenth Amendment in 1791. If the Court truly means by "sovereign immunity" what that term meant at common law, see *ante,* at 737, its argument would be insupportable. While sovereign immunity entered many new state legal systems as a part of the common law selectively received from England, it was not understood to be indefeasible or to have been given any such status by the new National Constitution, which did not mention it. See *Seminole Tribe, supra,* at 132–142, 160–162, and n. 55 (SOUTER, J., dissenting). Had the question been posed, state sovereign immunity could not have been thought to shield a State from suit under federal law on a subject committed to national jurisdiction by Article I of the Constitution. Congress exercising its conceded Article I power may unquestionably abrogate such immunity. I set out this position at length in my dissent in *Seminole Tribe* and will not repeat it here.[1]

The Court does not, however, offer today's holding as a mere corollary to its reasoning in *Seminole Tribe,* substituting the Tenth Amendment for the Eleventh as the occasion

---

[1] The Court inexplicably protests that "the right to trial by jury and the prohibition on unreasonable searches and seizures . . . derive from the common law," *ante,* at 733, but are nonetheless indefeasible. I cannot imagine how this could be thought relevant to my argument. These rights are constitutional precisely because they are enacted in the Sixth and Fourth Amendments, respectively, while the general prerogative of sovereign immunity appears nowhere in the Constitution. My point is that the common law rights that were not enacted into the Constitution were universally thought defeasible by statute.

demands, and it is fair to read its references to a "fundamental aspect" of state sovereignty as referring not to a prerogative inherited from the Crown, but to a conception necessarily implied by statehood itself. The conception is thus not one of common law so much as of natural law, a universally applicable proposition discoverable by reason. This, I take it, is the sense in which the Court so emphatically relies on Alexander Hamilton's reference in The Federalist No. 81, p. 548 (J. Cooke ed. 1961), to the States' sovereign immunity from suit as an "inherent" right, see *ante*, at 716, a characterization that does not require, but is at least open to, a natural law reading.

I understand the Court to rely on the Hamiltonian formulation with the object of suggesting that its conception of sovereign immunity as a "fundamental aspect" of sovereignty was a substantially popular, if not the dominant, view in the periods of Revolution and Confederation. There is, after all, nothing else in the Court's opinion that would suggest a basis for saying that the ratification of the Tenth Amendment gave this "fundamental aspect" its constitutional status and protection against any legislative tampering by Congress.[2] The Court's principal rationale for today's result, then, turns on history: was the natural law conception of sovereign immunity as inherent in any notion of an independent State widely held in the United States in the period preceding the ratification of 1788 (or the adoption of the Tenth Amendment in 1791)?

---

[2] I am assuming that the Court does not put forward the theory of the "fundamental aspect" as a newly derived conception of its own, necessarily comprehended by the Tenth Amendment guarantee only as a result of logic independent of any intention of the Framers. Nor does the Court argue, and I know of no reason to suppose, that every legal advantage a State might have enjoyed at common law was assumed to be an inherent attribute of all sovereignties, or was constitutionalized wholesale by the Tenth Amendment, any more than the Ninth Amendment constitutionalized all common law individual rights.

The answer is certainly no. There is almost no evidence that the generation of the Framers thought sovereign immunity was fundamental in the sense of being unalterable. Whether one looks at the period before the framing, to the ratification controversies, or to the early republican era, the evidence is the same. Some Framers thought sovereign immunity was an obsolete royal prerogative inapplicable in a republic; some thought sovereign immunity was a common law power defeasible, like other common law rights, by statute; and perhaps a few thought, in keeping with a natural law view distinct from the common law conception, that immunity was inherent in a sovereign because the body that made a law could not logically be bound by it. Natural law thinking on the part of a doubtful few will not, however, support the Court's position.

A

The American Colonies did not enjoy sovereign immunity, that being a privilege understood in English law to be reserved for the Crown alone; "antecedent to the Declaration of Independence, none of the colonies were, or pretended to be, sovereign states," 1 J. Story, Commentaries on the Constitution § 207, p. 149 (5th ed. 1891). Several colonial charters, including those of Massachusetts, Connecticut, Rhode Island, and Georgia, expressly specified that the corporate body established thereunder could sue and be sued. See 5 Sources and Documents of United States Constitutions 36 (W. Swindler ed. 1975) (Massachusetts); 2 id., at 131 (Connecticut); 8 id., at 363 (Rhode Island); 2 id., at 434 (Georgia). Other charters were given to individuals, who were necessarily subject to suit. See Gibbons, The Eleventh Amendment and State Sovereign Immunity: A Reinterpretation, 83 Colum. L. Rev. 1889, 1897 (1983). If a colonial lawyer had looked into Blackstone for the theory of sovereign immunity, as indeed many did, he would have found nothing clearly suggesting that the Colonies as such enjoyed any immunity

from suit. "[T]he law ascribes to the king the attribute of *sovereignty*, or pre-eminence," said Blackstone, 1 W. Blackstone, Commentaries *241 (hereinafter Blackstone), and for him, the sources for this notion were Bracton[3] and Acts of Parliament that declared the Crown imperial, *id.*, at *241–*242. It was simply the King against whom "no suit or action can be brought . . . even in civil matters, because no court can have jurisdiction over him." *Id.*, at *242.[4] If a

---

[3] Bracton is the earliest source for the common law immunity of the King, and his explanation is essentially practical: *"Si autem ab eo petatur, cum breve non currat contra ipsum, locus erit supplicationi, quod factum suum corrigat et emendet."* That is, "If [justice] is asked of him, since no writ runs against him there will [only] be opportunity for a petition, that he correct and amend his act." 2 Bracton, De Legibus et Consuetudinibus Angliae 33 (G. Woodbine ed., S. Thorne transl. 1968) (London 1569 ed., folio 5b, Bk. I, ch. 8). The fact that no writ ran against the King was "no peculiar privilege; for no feudal lord could be sued in his own court." 3 W. Holdsworth, History of English Law 465 (3d ed. 1927). "'He can not be compelled to answer in his own court, but this is true of every petty lord of every petty manor; that there happens to be in this world no court above his court is, we may say, an accident.'" *Nevada* v. *Hall*, 440 U. S. 410, 415, n. 6 (1979) (quoting 1 F. Pollock & F. Maitland, History of English Law 518 (2d ed. 1899)). It was this same view of the immunity that came down to Blackstone, who cited Finch for the view that the King must be petitioned and not sued. See H. Finch, Law, or a Discourse thereof, in Four Books 255 (1678 ed., reprinted 1992) ("Here in place of action against the King petition must be made unto him in the Chancery, or in Parliament, for no action did ever lie against the K[ing] at the Common Law, but the party is driven to his petition" (footnotes omitted)); 1 Blackstone *242.

[4] As I explain, *infra*, at 767–768, this common law conception of sovereign immunity differed from the natural law version, which understood immunity as derived from the fact that the sovereign was the font of the law, which could not bind him. I do not dispute, indeed I insist, that in England it was the common law version that existed, and so it is beside the point for the Court to protest that the King could not be sued under French law in his own courts, see *ante*, at 735; naturally not, since the common law conception was not couched in terms of who was the font of the law. This said, I note that it is surprising for the Court to say that "[i]t is doubtful whether the King was regarded . . . as the font of the

person should have "a just demand upon the king, he must petition him in his court of chancery, where his chancellor will administer right as a matter of grace, though not upon compulsion." *Id.*, at *243.

It is worth pausing here to note that after Blackstone had explained sovereign immunity at common law, he went on to say that the common law tradition was compatible with sovereign immunity as discussed by writers on "natural law":

> "And this is entirely consonant to what is laid down by the writers on natural law. 'A subject,' says Puffendorf, 'so long as he continues a subject, hath no way to *oblige* his prince to give him his due, when he refuses it; though no wise prince will ever refuse to stand to a lawful contract. And, if the prince gives the subject leave to enter an action against him, upon such contract, in his own courts, the action itself proceeds rather upon natural equity, than upon the municipal laws.' For the end of such action is not to *compel* the prince to observe the contract, but to *persuade* him." *Ibid.* (footnote omitted).[5]

---

traditions and customs which formed the substance of the common law," *ibid.* Although Bracton said that "law makes the king," 2 Bracton, at 33, he also said that the unwritten law of England could properly be called law only to the extent that "the authority of the king or prince [has] first been added thereto," *id.*, at 19, and he spoke of "these English laws and customs, by the authority of kings," *id.*, at 21. The judges who announced the common law sat "in the place of the king," *id.*, at 20, and so in practice the common law certainly derived from him. Thus, at least for the most part, "[t]he custom of the king's court is the custom of England, and becomes the common law." 1 Pollock & Maitland, *supra* n. 3, at 184. But for this, Blackstone would probably not have remarked that the natural law theory produced a result "consonant" with the common law, 1 Blackstone *243; see *infra* this page and 768.

[5] For the original of the quoted passage, see 1 S. Pufendorf, De Jure Naturae et Gentium Libri Octo 915 (1688 ed., reprinted 1934); for a modern translation, see 2 S. Pufendorf, De Jure Naturae et Gentium Libri Octo 1344–1345 (C. & W. Oldfather transl. 1934) (hereinafter Pufendorf). Else-

Next Blackstone quoted Locke's explanation for immunity, according to which the risks of overreaching by "'a heady prince'" are "'well recompensed by the peace of the public and security of the government, in the person of the chief magistrate being thus set out of the reach of danger.'" *Ibid.* (quoting J. Locke, Second Treatise of Civil Government § 205 (1690 J. Gough ed. 1947)). By quoting Pufendorf and Locke, Blackstone revealed to his readers a legal-philosophical tradition that derived sovereign immunity not from the immemorial practice of England but from general theoretical principles. But although Blackstone thus juxtaposed the common law and natural law[6] conceptions of sovereign im-

---

where in the same chapter, Pufendorf expressly derives the impossibility of enforcing a King's promises against him from natural law theory: "Therefore, since a king enjoys natural liberty, if he has discovered any fault in a pact of his making, he can of his own authority serve notice upon the other party that he refuses to be obligated by reason of that fault; nor does he have to secure of the other [party to the pact] a release from a thing [namely, the pact] which, of its own nature, is incapable of producing an obligation or right." *Id.,* at 1342-1343.

[6] The Court says that to call its approach "natural law" is "an apparent attempt to disparage," *ante,* at 758. My object, however, is not to call names but to show that the majority is wrong, and in doing that it is illuminating to explain the conceptual tradition on which today's majority draws, one that can be traced to the Court's opinion from its origins in Roman sources. I call this conception the "natural law" view of sovereign immunity, despite the historical ambiguities associated with the term, because the expression by such figures as Pufendorf, Hobbes, and Locke, of the doctrine that the sovereign might not be sued, was associated with a concept of sovereignty itself derived from natural law. See Pufendorf 1103-1104; T. Hobbes, Leviathan Part 2, chs. 17-18 (1651), in 23 Great Books of the Western World 99-104 (1952) (hereinafter Leviathan) (describing sovereignty as the result of surrender of individual natural rights to single authority); J. Locke, Second Treatise of Civil Government §§ 95-99 (1690 J. Gough ed. 1947) (describing political community formed by individual consent out of a state of nature). The doctrine that the sovereign could not be sued by his subjects might have been thought by medieval civil lawyers to belong to *jus gentium,* the law of nations, which was a type of natural law; or perhaps in its original form it might have been understood as a precept of positive, written law. The earliest source

munity, he did not confuse them. It was as well he did not, for although the two conceptions were arguably "consonant" in England, where according to Blackstone, the Crown was sovereign,[7] their distinct foundations could make a difference in America, where the location of sovereignty was an issue that independence would raise with some exigence.

## B

Starting in the mid-1760's, ideas about sovereignty in colonial America began to shift as Americans argued that, lacking a voice in Parliament, they had not in any express way consented to being taxed. See B. Bailyn, The Ideological Origins of the American Revolution 204–219 (1968); G. Wood, The Creation of the American Republic, 1776–1787, pp. 347–348 (1969). The story of the subsequent development of conceptions of sovereignty is complex and uneven;

---

for this conception is a statement of Ulpian's recorded in the Digest, I.3.31, and much interpreted by medieval jurists, *"Princeps legibus solutus est"*; "The emperor is not bound by statutes." See 1 The Digest of Justinian 13 (T. Mommsen & P. Krueger eds., A. Watson transl. 1985); Tierney, The Prince Is Not Bound by the Laws: Accursius and the Origins of the Modern State, 5 Comparative Studies in Society and History 378 (1963); K. Pennington, The Prince and the Law, 1200–1600: Sovereignty and Rights in the Western Legal Tradition 77–79 (1993). Through its reception and discussion in the continental legal tradition, where it related initially to the Emperor, but also eventually to a King, to the Pope, and even to a city-state, see *id.*, at 90, this conception of sovereign immunity developed into a theoretical model applicable to any sovereign body. Thus Hobbes could begin his discussion of the subject by saying, "The sovereign of a Commonwealth, be it an assembly or one man, is not subject to the civil laws." Leviathan, ch. 26, p. 130. There is debate on the degree to which different medieval interpreters of the maxim *Princeps legibus solutus est* understood natural or divine law to limit the prince's freedom from the statutes. See Tierney, *supra*, at 390–394; Pennington, *supra*, at 206–208; J. Canning, The Political Thought of Baldus de Ubaldis 74–79 (1987).

[7] A better formulation would have clarified that sovereignty resided in the King in Parliament, which was the dominant view by the later 17th century. See, *e. g.*, G. Wood, The Creation of the American Republic, 1776–1787, p. 347 (1969).

here, it is enough to say that by the time independence was declared in 1776, the locus of sovereignty was still an open question, except that almost by definition, advocates of independence denied that sovereignty with respect to the American Colonies remained with the King in Parliament.

As the concept of sovereignty was unsettled, so was that of sovereign immunity. Some States appear to have understood themselves to be without immunity from suit in their own courts upon independence.[8] Connecticut and Rhode Island adopted their pre-existing charters as constitutions, without altering the provisions specifying their suability. See Gibbons, 83 Colum. L. Rev., at 1898, and nn. 42–43. Other new States understood themselves to be inheritors of the Crown's common law sovereign immunity and so enacted statutes authorizing legal remedies against the State parallel to those available in England.[9] There, although the Crown

---

[8] The Court claims that the doctrine of sovereign immunity was "universal in the States when the Constitution was drafted and ratified," *ante*, at 715–716, but the examples of Connecticut and Rhode Island suggest that this claim is overstated. It is of course true that these States' preservation without comment of their colonial suability could be construed merely as a waiver of sovereign immunity, and not as a denial of the principle. But in light of these States' silence as to any change in their status as suable bodies, it would be tendentious so to understand it. The Court relies for its claim on Justice Iredell's statement in *Chisholm* v. *Georgia*, 2 Dall. 419 (1793), that there was "no doubt" that no State had "'any particular Legislative mode, authorizing a compulsory suit for the recovery of money against a State . . . either when the Constitution was adopted, or at the time the judicial act was passed.'" *Ante*, at 716 (quoting *Chisholm, supra*, at 434–435). But as the cases of Rhode Island and Connecticut demonstrate, Justice Iredell was simply wrong. As I have had occasion to say elsewhere, that an assertion of historical fact has been made by a Justice of the Court does not make it so. See *Seminole Tribe of Fla.* v. *Florida*, 517 U. S. 44, 107, n. 5 (1996) (dissenting opinion).

[9] The Court seems to think I have overlooked this point, that the exceptions imply a rule, see *ante*, at 724 (provisions for chancery petitions "only confir[m]" immunity enjoyed by these States). The reason for canvassing the spectrum of state thought and practice is not to deny the undoubted place of sovereign immunity in most States' courts, but to examine what

was immune from suit, the contemporary practice allowed private litigants to seek legal remedies against the Crown through the petition of right or the *monstrans de droit* in the Chancery or Exchequer. See 3 Blackstone *256–*257. A Virginia statute provided:

> " 'Where the auditors according to their discretion and judgment shall disallow or abate any article of demand against the commonwealth, and any person shall think himself aggrieved thereby, he shall be at liberty to petition the high court of chancery or the general court, according to the nature of his case, for redress, and such court shall proceed to do right thereon; and a like petition shall be allowed in all other cases to any other person who is entitled to demand against the commonwealth any right in law or equity.' " 9 W. Hening, Statutes at Large: Being a Collection of the Laws of Virginia 536, 540 (1821), quoted in Pfander, Sovereign Immunity and the Right to Petition: Toward a First Amendment Right to Pursue Judicial Claims Against the Government, 91 Nw. U. L. Rev. 899, 939–940, and n. 142 (1997).

This "petition" was clearly reminiscent of the English petition of right, as was the language "shall proceed to do right thereon," which paralleled the formula of royal approval, *"soit droit fait al partie,"* technically required before a petition of right could be adjudicated. See 3 Blackstone *256; Pfander, *supra*, at 940, and nn. 143–144. A New York statute similarly authorized petition to the court of chancery by anyone who thought himself aggrieved by the state auditor general's resolution of his account with the State. See An Act Directing a Mode for the Recovery of Debts Due to, and the Settlement of Accounts with, this State, March 30, 1781,

---

turns out to be the scanty evidence that the States understood sovereign immunity in the indefeasible, civilian, natural law sense, necessary to support the Court's position here.

in The First Laws of the State of New York 192 (1782 ed., reprinted 1984); see also Pfander, *supra*, at 941, and n. 145.

Pennsylvania not only adopted a law conferring the authority to settle accounts upon the Comptroller General, see Act of Apr. 13, 1782, ch. 959, 2 Laws of the Commonwealth of Pennsylvania 19 (1810), but in 1785 provided for appeal from such adjudications to the Pennsylvania Supreme Court, where a jury trial could be had, see *id.*, at 26–27; Pfander, *supra*, at 941, n. 147. Although in at least one recorded case before the Pennsylvania Supreme Court the Commonwealth, citing Blackstone, pleaded common law sovereign immunity, see *Respublica* v. *Sparhawk*, 1 Dall. 357, 363 (Pa. 1788), the Supreme Court of Pennsylvania did not reach this argument, concluding on other grounds that it lacked jurisdiction.[10] Two years after this decision, under the influence of James Wilson, see C. Jacobs, The Eleventh Amendment and Sovereign Immunity 25, and 169, n. 53 (1972), Pennsylvania adopted a new constitution, which provided that "[s]uits may be brought against the commonwealth in such manner, in such courts, and in such cases as the legislature may by law direct." Pa. Const., Art. IX, §11 (1790), reprinted in 8 Sources and Documents of United States Constitutions, at 293; see also Pfander, *supra*, at 928, n. 101.[11]

---

[10] In a suit against Virginia in the Court of Common Pleas for Philadelphia County, Virginia pleaded sovereign immunity in natural law terms, and the sheriff was excused from making return of the writ attaching Virginia's goods, see *Nathan* v. *Virginia*, 1 Dall. 77, n. (1781), but this was only after the Supreme Executive Council of the Commonwealth had already ordered the goods returned and, in any event, involved the immunity of one State in the courts of another, and not the distinct immunity of a State in her own courts, see *Nevada* v. *Hall*, 440 U. S., at 414.

[11] Whether this formulation was a constitutional waiver of sovereign immunity or an affirmative repudiation of its applicability is uncertain, but the broad language opening the courts to all suits, and the apparent desire to exceed the previously available statutory scheme, would appear to support the latter interpretation.

Around the time of the Constitutional Convention, then, there existed among the States some diversity of practice with respect to sovereign immunity; but despite a tendency among the state constitutions to announce and declare certain inalienable and natural rights of men and even of the collective people of a State, see, *e. g.*, Pennsylvania Constitution, Art. III (1776), 8 Sources and Documents of United States Constitutions, *supra*, at 278 ("That the people of this State have the sole, exclusive and inherent right of governing and regulating the internal police of the same"), no State declared that sovereign immunity was one of those rights. To the extent that States were thought to possess immunity, it was perceived as a prerogative of the sovereign under common law. And where sovereign immunity was recognized as barring suit, provisions for recovery from the State were in order, just as they had been at common law in England.

C

At the Constitutional Convention, the notion of sovereign immunity, whether as natural law or as common law, was not an immediate subject of debate, and the sovereignty of a State in its own courts seems not to have been mentioned. This comes as no surprise, for although the Constitution required state courts to apply federal law, the Framers did not consider the possibility that federal law might bind States, say, in their relations with their employees.[12]   In the subse-

---

[12] The Court says, "the Founders' silence is best explained by the simple fact that no one, not even the Constitution's most ardent opponents, suggested the document might strip States of the immunity." *Ante*, at 741.   In fact, a stalwart supporter of the Constitution, James Wilson, laid the groundwork for just such a view at the Pennsylvania Convention, see *infra*, at 777–778.   For the most part, it is true, the surviving records of the ratifying conventions do not suggest that much thought was given to the issue of suit against States in their own courts.   But this silence does not tell us that the Framers' generation thought the prerogative so well settled as to be an inherent right of States, and not a common law creation. It says only that at the conventions, the issue was not on the participants'

quent ratification debates, however, the issue of jurisdiction over a State did emerge in the question whether States might be sued on their debts in federal court, and on this point, too, a variety of views emerged and the diversity of sovereign immunity conceptions displayed itself.

The only arguable support for the Court's absolutist view that I have found among the leading participants in the debate surrounding ratification was the one already mentioned, that of Alexander Hamilton in The Federalist No. 81, where he described the sovereign immunity of the States in language suggesting principles associated with natural law:

> "It is inherent in the nature of sovereignty, not to be amenable to the suit of an individual *without its consent.* This is the general sense and the general practice of mankind; and the exemption, as one of the attributes of sovereignty, is now enjoyed by the government of every state in the union.  Unless therefore, there is a surrender of this immunity in the plan of the convention, it will remain with the states, and the danger intimated [that States might be sued on their debts in federal court] must be merely ideal. . . . The contracts between a nation and individuals are only binding on the conscience of the sovereign, and have no pretensions to a compulsive force.  They confer no right of action independent of the sovereign will."  The Federalist No. 81, at 548–549.

Hamilton chose his words carefully, and he acknowledged the possibility that at the Convention the States might have surrendered sovereign immunity in some circumstances, but the thrust of his argument was that sovereign immunity was "inherent in the nature of sovereignty." [13]  An echo of Pufen-

---

minds because the nature of sovereignty was not always explicitly addressed.

[13] In *Seminole Tribe*, I explained that Hamilton had in mind state sovereign immunity only with respect to diversity cases applying state contract law.  See 517 U. S., at 145–149 (dissenting opinion).  Here I intend simply

dorf may be heard in his reference to "the conscience of the sovereign"; [14] and the universality of the phenomenon of sovereign immunity, which Hamilton claimed ("the general sense and the general practice of mankind"), is a peculiar feature of the natural law conception. The apparent novelty and uniqueness of Hamilton's employment of natural law terminology to explain the sovereign immunity of the States is worth remarking, because it stands in contrast to formulations indicating no particular position on the natural-law-versus-common-law origin, to the more widespread view that sovereign immunity derived from common law, and to the more radical stance that the sovereignty of the people made sovereign immunity out of place in the United States. Hamilton's view is also worth noticing because, in marked contrast to its prominence in the Court's opinion today, as well as in *Seminole Tribe*, 517 U. S., at 54, and in *Hans v. Louisiana*, 134 U. S. 1, 13 (1890), cf. *Great Northern Life Ins. Co.*

---

to point out that with respect to state law, in the main Hamilton spoke consistently with deriving sovereign immunity from a natural law model. That he did so is consistent with his focus on state law; Hamilton almost certainly knew that the natural law theory of sovereign immunity extended only to rights created by the sovereign, and so would not have applied to federal-question claims against a State in either state or federal court. Thus when the Court claims that subjecting States to suit in state court "would turn on its head the concern of the founding generation—that Article III might be used to circumvent state-court immunity," *ante*, at 743, it has failed to realize that even those Framers who, like Hamilton, aimed to preserve state sovereign immunity, had in mind only state immunity on state-law claims, not federal questions.

[14] Pufendorf's discussion of sovereign immunity, just before the passage quoted by Blackstone, begins (in a modern translation): "Now although promises and pacts are as binding upon the conscience of a king as upon that of any private citizen, there is, nevertheless, this difference between the obligation of a king and that of subjects, namely, that it is no trouble for the former to exact what is owed him from a subject, when he demurs, while a citizen, so long as he remains such, has no means within his power to recover his due from a king against his will." 2 Pufendorf 1344–1345.

v. *Read*, 322 U. S. 47, 51 (1944), it found no favor in the early Supreme Court, see *infra*, at 781.

In the Virginia ratifying convention, Madison was among those who debated sovereign immunity in terms of the result it produced, not its theoretical underpinnings. He maintained that "[i]t is not in the power of individuals to call any state into court," 3 Debates on the Federal Constitution 533 (J. Elliot 2d ed. 1863) (hereinafter Elliot's Debates), and thought that the phrase "in which a State shall be a Party" in Article III, § 2, must be interpreted in light of that general principle, so that "[t]he only operation it can have, is that, if a state should wish to bring a suit against a citizen, it must be brought before the federal court." Elliot's Debates 533.[15] John Marshall argued along the same lines against the possibility of federal jurisdiction over private suits against States, and he invoked the immunity of a State in its own courts in support of his argument:

> "I hope that no gentleman will think that a state will be called at the bar of the federal court. Is there no such case at present? Are there not many cases in which the legislature of Virginia is a party, and yet the state is not sued? It is not rational to suppose that the sovereign power should be dragged before a court." *Id.*, at 555.

There was no unanimity among the Virginians either on state- or federal-court immunity, however, for Edmund Randolph anticipated the position he would later espouse as plaintiff's counsel in *Chisholm* v. *Georgia*, 2 Dall. 419 (1793). He contented himself with agnosticism on the significance of what Hamilton had called "the general practice of mankind," and argued that notwithstanding any natural law view of the nonsuability of States, the Constitution permitted suit against a State in federal court: "I think, whatever the law

---

[15] Madison seems here to have overlooked the possibility of concurrent jurisdiction between the Supreme Court's original jurisdiction and that of state courts.

of nations may say, that any doubt respecting the construction that a state may be plaintiff, and not defendant, is taken away by the words *where a state shall be a party.*" 3 Elliot's Debates 573. Randolph clearly believed that the Constitution both could, and in fact by its language did, trump any inherent immunity enjoyed by the States; his view on sovereign immunity in state court seems to have been that the issue was uncertain ("whatever the law of nations may say").

At the furthest extreme from Hamilton, James Wilson made several comments in the Pennsylvania Convention that suggested his hostility to any idea of state sovereign immunity. First, he responded to the argument that "the sovereignty of the states is destroyed" if they are sued by the United States, "because a suiter in a court must acknowledge the jurisdiction of that court, and it is not the custom of sovereigns to suffer their names to be made use of in this manner." 2 *id.*, at 490. For Wilson, "[t]he answer [was] plain and easy: the government of each state ought to be subordinate to the government of the United States." *Ibid.*[16] Wil-

---

[16] The Court says this statement of Wilson's is "startling even today," *ante*, at 725, but it is hard to see what is so startling, then or now, about the proposition that, since federal law may bind state governments, the state governments are in this sense subordinate to the national. The Court seems to have forgotten that one of the main reasons a Constitutional Convention was necessary at all was that under the Articles of Confederation Congress lacked the effective capacity to bind the States. The Court speaks as if the Supremacy Clause did not exist or *McCulloch* v. *Maryland*, 4 Wheat. 316 (1819), had never been decided.

Nor is the Court correct to say that the views of Wilson, Randolph, and General Charles Cotesworth Pinckney, see n. 17, *infra*, "cannot bear the weight" I put upon them, *ante*, at 725. Indeed, the yoke is light, since I intend these Framers only to do their part in showing that a diversity of views with respect to sovereignty and sovereign immunity existed at the several state conventions, and that this diversity stands in the way of the Court's assumption that the founding generation understood sovereign

son was also pointed in commenting on federal jurisdiction over cases between a State and citizens of another State: "When this power is attended to, it will be found to be a necessary one. Impartiality is the leading feature in this Constitution; it pervades the whole. When a citizen has a controversy with another state, there ought to be a tribunal where both parties may stand on a just and equal footing." *Id.*, at 491. Finally, Wilson laid out his view that sovereignty was in fact not located in the States at all: "Upon what principle is it contended that the sovereign power resides in the state governments? The honorable gentleman has said truly, that there can be no subordinate sovereignty. Now, if there cannot, my position is, that the sovereignty resides in the people; they have not parted with it; they have only dispensed such portions of the power as were conceived necessary for the public welfare." *Id.*, at 443.[17] While this

---

immunity in the natural law sense as indefeasibly "fundamental" to statehood.

Finally, the Court calls Wilson's view "a radical nationalist vision of the constitutional design," *ibid.*, apparently in an attempt to discount it. But while Wilson's view of sovereignty was indeed radical in its deviation from older conceptions, this hardly distanced him from the American mainstream, and in October 1787, Washington himself called Wilson "as able, candid, & honest a member as any in Convention," 5 Papers of George Washington: Confederation Series 379 (W. Abbot & D. Twohig eds. 1997).

[17] Nor was Wilson alone in this theory. At the South Carolina Convention, General Charles Cotesworth Pinckney, who had attended the Philadelphia Convention, took the position that the States never enjoyed individual and unfettered sovereignty, because the Declaration of Independence was an act of the Union, not of the particular States. See 4 Elliot's Debates 301. In his view, the Declaration "sufficiently confutes the . . . doctrine of the individual sovereignty and independence of the several states. . . . The separate independence and individual sovereignty of the several states were never thought of by the enlightened band of patriots who framed this Declaration; the several states are not even mentioned by name in any part of it,—as if it was intended to impress this maxim on America, that our freedom and independence arose from our

statement did not specifically address sovereign immunity, it expressed the major premise of what would later become Justice Wilson's position in *Chisholm*: that because the people, and not the States, are sovereign, sovereign immunity has no applicability to the States.

From a canvass of this spectrum of opinion expressed at the ratifying conventions, one thing is certain. No one was espousing an indefeasible, natural law view of sovereign immunity. The controversy over the enforceability of state debts subject to state law produced emphatic support for sovereign immunity from eminences as great as Madison and Marshall, but neither of them indicated adherence to any immunity conception outside the common law.

## D

At the close of the ratification debates, the issue of the sovereign immunity of the States under Article III had not been definitively resolved, and in some instances the indeterminacy led the ratification conventions to respond in ways that point to the range of thinking about the doctrine. Several state ratifying conventions proposed amendments and issued declarations that would have exempted States from subjection to suit in federal court.[18] The New York Conven-

---

union, and that without it we could neither be free nor independent." *Ibid.*

[18] "[T]he grand objection, that the states were made subject to the action of an individual, still remained for several years, notwithstanding the concurring dissent of several states at the time of accepting the constitution." 1 W. Blackstone, Commentaries, App. 352 (St. G. Tucker ed. 1803). In a footnote, Tucker specified that "[t]he several conventions of Massachusetts, New Hampshire, Rhode Island, New York, Virginia, and North Carolina, proposed amendments in this respect." *Ibid.* The proposed amendments of the latter four States, which may be found in Elliot's Debates, are discussed immediately *infra* this page and 779–781. The extant published versions of the proposed amendments of Massachusetts and New Hampshire do not include such a proposed amendment. See, *e. g.,* 1 Elliot's Debates 322–323 (nine proposed amendments of Massachusetts); 2 *id.,* at 177–178 (same); H. R. Doc. No. 398, 69th Cong., 1st Sess., 1018–1020 (1927)

tion's statement of ratification included a series of declarations framed as proposed amendments, among which was one stating "That the judicial power of the United States, in cases in which a state may be a party, does not extend to criminal prosecutions, or to authorize any suit by any person against a state." 1 Elliot's Debates 329.[19] Whether that amendment was meant to alter or to clarify Article III as ratified is uncertain, but regardless of its precise intent, New York's response to the draft proposed by the Convention of 1787 shows that there was no consensus at all on the question of state suability (let alone on the underlying theory of immunity doctrine). There was, rather, an unclear state of affairs which it seemed advisable to stabilize.

The Rhode Island Convention, when it finally ratified on June 16, 1790, called upon its representatives to urge the passage of a list of amendments. This list incorporated language, some of it identical to that proposed by New York, in the following form:

> "It is declared by the Convention, that the judicial power of the United States, in cases in which a state may be a party, does not extend to criminal prosecutions, or to authorize any suit by any person against a state; but, to remove all doubts or controversies respect-

---

(same); 1 Elliot's Debates 325–326 (12 proposed amendments of New Hampshire); H. R. Doc. No. 398, *supra,* at 1025–1026 (same).

[19] It is conceivable that the New York Convention, which was after all the intended audience for The Federalist, thought that the States had some sort of an inherent right against being sued in federal court. But this is unlikely, because numerous other of the proposed amendments declared so-called "rights" in no uncertain terms, see, *e. g.,* 1 Elliot's Debates 328 ("[T]he people have an equal, natural, and unalienable right freely and peaceably to exercise their religion"; trial by jury is "one of the greatest securities to the rights of a free people"; "[T]he people have a right peaceably to assemble together"), whereas the proposed amendment regarding suits against States simply stated that the judicial power "does not extend . . . to authorize any suit by any person against a state," and said nothing about any rights, inherent or otherwise. *Id.,* at 329.

ing the same, that it be especially expressed, as a part
of the Constitution of the United States, that Congress
shall not, directly or indirectly, either by themselves or
through the judiciary, interfere with any one of the
states . . . in liquidating and discharging the public secu-
rities of any one state." *Id.*, at 336.

Even more clearly than New York's proposal, this amend-
ment appears to have been intended to clarify Article III as
reflecting some theory of sovereign immunity, though with-
out indicating which one.

Unlike the Rhode Island proposal, which hinted at a clari-
fication of Article III, the Virginia and North Carolina ratify-
ing conventions proposed amendments that by their terms
would have fundamentally altered the content of Article III.
The Virginia Convention's proposal for a new Article III
omitted entirely the language conferring federal jurisdiction
over a controversy between a State and citizens of another
State, see 3 *id.*, at 660–661, and the North Carolina Conven-
tion proposed an identical amendment, see 4 *id.*, at 246–247.
These proposals for omission suggest that the conventions
of Virginia and North Carolina thought they had subjected
themselves to citizen suits under Article III as enacted, and
that they wished not to have done so.[20]   There is, thus, no
suggestion in their resolutions that Article III as drafted
was fundamentally at odds with an indefeasible natural law
sovereignty, or with a conception that went to the essence of
what it meant to be a State.   At all events, the state ratify-
ing conventions' felt need for clarification on the question of

---

[20] The Court says "there is no evidence that [the proposed amendments]
were directed toward the question of sovereign immunity or that they
reflect an understanding that the States would be subject to private suits
without consent under Article III as drafted." *Ante*, at 725. No evi-
dence, that is, except the proposed amendments themselves, which would
have omitted the Citizen-State Diversity Clause.  If the proposed omis-
sion is not evidence going to sovereign immunity to private suits, one
wonders what would satisfy the Court.

state suability demonstrates that uncertainty surrounded the matter even at the moment of ratification. This uncertainty set the stage for the divergent views expressed in *Chisholm.*

### E

If the natural law conception of sovereign immunity as an inherent characteristic of sovereignty enjoyed by the States had been broadly accepted at the time of the founding, one would expect to find it reflected somewhere in the five opinions delivered by the Court in *Chisholm* v. *Georgia,* 2 Dall. 419 (1793). Yet that view did not appear in any of them. And since a bare two years before *Chisholm,* the Bill of Rights had been added to the original Constitution, if the Tenth Amendment had been understood to give federal constitutional status to state sovereign immunity so as to endue it with the equivalent of the natural law conception, one would be certain to find such a development mentioned somewhere in the *Chisholm* writings. In fact, however, not one of the opinions espoused the natural law view, and not one of them so much as mentioned the Tenth Amendment. Not even Justice Iredell, who alone among the Justices thought that a State could not be sued in federal court, echoed Hamilton or hinted at a constitutionally immutable immunity doctrine.

*Chisholm* presented the questions whether a State might be made a defendant in a suit brought by a citizen of another State, and if so, whether an action of assumpsit would lie against it. See *id.,* at 420 (questions presented).[21] In rep-

---

[21] The case had first been brought before the Federal Circuit Court for the District of Georgia, over which Justice Iredell and District Judge Nathaniel Pendleton had presided. Ultimately, Justice Iredell held that the Circuit Court had no jurisdiction in the case because Congress had not conferred such jurisdiction on it. See 5 Documentary History of the Supreme Court of the United States, 1789–1800, pp. 128–129, 154 (M. Marcus ed. 1994). Georgia had maintained that it was "a free, sov[e]reign, and independent State, and . . . cannot be drawn or compelled, nor at any Time

resenting Chisholm, Edmund Randolph, the Framer[22] and then Attorney General, not only argued for the necessity of a federal forum to vindicate private rights against the States, see *id.*, at 422, but rejected any traditional conception of sovereignty. He said that the sovereignty of the States, which he acknowledged, *id.*, at 423, was no barrier to jurisdiction, because "the present Constitution produced a new order of things. It derives its origin immediately from the people . . . . The States are in fact assemblages of these individuals who are liable to process," *ibid.*

Justice Wilson took up the argument for the sovereignty of the people more vociferously. Building on a conception of sovereignty he had already expressed at the Pennsylvania

---

past hath been accustomed to be, or could be drawn or compelled to answer against the will of the said State of Georgia, before any Justices of the federal Circuit Court for the District of Georgia or before any Justices of any Court of Law or Equity whatever." Plea to the Jurisdiction, Oct. 17, 1791, *id.*, at 143. Chisholm demurred to the plea on the apparent ground that while the plea alleged that Georgia could not be compelled to appear before any court, Article III expressly declared that the federal judicial power extended to all controversies between a State and citizens of another State. Demurrer, *id.*, at 144. In his unreported opinion, Justice Iredell dispensed with this demurrer. He first stated that the plea sufficiently alleged that the District Court lacked jurisdiction. *Id.*, at 150. He added that in any case, the existence of Congress's constitutional authority to create courts to hear controversies between a State and citizens of another State did not mean that Congress had in fact created such courts. *Id.*, at 151. Third, Justice Iredell pointed out that the right to create courts for cases in which a State was a party did not mean that Congress could confer jurisdiction in cases like the one at bar, because the word "controversies" in Article III might refer only to situations "where such controversies could formerly have been maintained" in state court. Since "under the jurisdiction of a particular State Sovereigns may be liable in some instances but not in others," just as "[i]n England the property in possession of the crown can be affected by an adverse Process, tho' certainly the King cannot be sued for the recovery of a sum of money," *ibid.*, it appeared to Justice Iredell that under some conditions Article III did not authorize suits against States.

[22] Framer but not signer.

ratifying convention, see *supra*, at 777–778, he began by noting what he took to be the pregnant silence of the Constitution regarding sovereignty:

"To the Constitution of the *United States* the term SOVEREIGN, is totally unknown. There is but one place where it could have been used with propriety. But, even in that place it would not, perhaps, have comported with the delicacy of those, who *ordained* and *established* that Constitution. They *might* have announced themselves 'SOVEREIGN' people of the *United States:* But serenely conscious of the *fact*, they avoided the *ostentatious declaration.*" 2 Dall., at 454.

As if to contrast his own directness[23] with the Framers' delicacy, the Framer-turned-Justice explained in no uncertain terms that Georgia was not sovereign with respect to federal jurisdiction (even in a diversity case):

"As a Judge of this Court, I know, and can decide upon the knowledge, that the citizens of *Georgia*, when they acted upon the large scale of the *Union*, as a part of the 'People of the United States,' did *not* surrender the Supreme or sovereign Power to that State; but, *as to*

---

[23] Justice Wilson hinted that in his own private view, citizens of the States had not conferred sovereignty in the sense of absolute authority upon their state governments, because they had retained some rights to themselves: "[A]ccording to some writers, every State, which governs itself without any dependence on another power, is a sovereign State. Whether, with regard to her own citizens, this is the case of the State of *Georgia;* whether those citizens have done, as the individuals of *England* are said, by their late instructors, to have done, surrendered the Supreme Power to the State or Government, and reserved nothing to themselves; or whether, like the people of other States, and of the *United States*, the citizens of *Georgia* have reserved the Supreme Power in their own hands; and on that Supreme Power have made the State *dependent*, instead of being sovereign; these are questions, to which, as a Judge in this cause, I can neither know nor suggest the proper answers; though, as a citizen of the *Union*, I know, and am interested to know, that the most satisfactory answers can be given." *Chisholm*, 2 Dall., at 457 (citation omitted).

*the purposes of the Union,* retained it to themselves. *As to the purposes of the Union,* therefore, *Georgia is* NOT *a sovereign State." Id.,* at 457.

This was necessarily to reject any natural law conception of sovereign immunity as inherently attached to an American State, but this was not all. Justice Wilson went on to identify the origin of sovereign immunity in the feudal system that had, he said, been brought to England and to the common law by the Norman Conquest. After quoting Blackstone's formulation of the doctrine as it had developed in England, he discussed it in the most disapproving terms imaginable:

"This last position [that the King is sovereign and no court can have jurisdiction over him] is only a branch of a much more extensive principle, on which a plan of systematic despotism has been lately formed in *England,* and prosecuted with unwearied assiduity and care. Of this plan the author of the Commentaries was, if not the introducer, at least the great supporter. He has been followed in it by writers later and less known; and his doctrines have, both on the other and *this* side of the Atlantic, been implicitly and generally received by those, who neither examined their *principles* nor their *consequences[.]* The principle is, that all human law must be prescribed by a *superior.* This principle I mean not now to examine. Suffice it, at present to say, that another principle, very different in its nature and operations, forms, in my judgment, the basis of sound and genuine jurisprudence; laws derived from the pure source of equality and justice must be founded on the CONSENT of those, whose obedience they require. The *sovereign,* when traced to his source, must be found in the *man." Id.,* at 458.

With this rousing conclusion of revolutionary ideology and rhetoric, Justice Wilson left no doubt that he thought the

doctrine of sovereign immunity entirely anomalous in the American Republic. Although he did not speak specifically of a State's immunity in its own courts, his view necessarily requires that such immunity would not have been justifiable as a tenet of absolutist natural law.

Chief Justice Jay took a less vehement tone in his opinion, but he, too, denied the applicability of the doctrine of sovereign immunity to the States. He explained the doctrine as an incident of European feudalism, *id.*, at 471, and said that by contrast,

> "[n]o such ideas obtain here; at the Revolution, the sovereignty devolved on the people; and they are truly the sovereigns of the country, but they are *sovereigns without subjects* (unless the *African* slaves among us may be so called) and have none to govern but *themselves;* the citizens of *America* are equal as fellow citizens, and as joint tenants in the sovereignty." *Id.*, at 471–472.

From the difference between the sovereignty of princes and that of the people, Chief Justice Jay argued, it followed that a State might be sued. When a State sued another State, as all agreed it could do in federal court, all the people of one State sued all the people of the other. "But why it should be more incompatible, that all the people of a State should be sued by *one* citizen, than by one hundred thousand, I cannot perceive, the process in both cases being alike; and the consequences of a judgment alike." *Id.*, at 473. Finally, Chief Justice Jay pointed out, Article III authorized suits between a State and citizens of another State. Although the Chief Justice reserved judgment on whether the United States might be sued by a citizen, given that the courts must rely on the Executive to implement their decisions, he made it clear that this reservation was practical, and not theoretical: "I wish the State of society was so far improved, and the science of Government advanced to such a degree of perfection, as that the whole nation could in the peaceable course

of law, be compelled to do justice, and be sued by individual citizens." *Id.*, at 478. Although Chief Justice Jay did not speak specifically to the question of state sovereign immunity in state court, his theory shows that he considered not the States, but the people collectively, to be sovereign; and there is thus no reason to think he would have denied that the people of the Nation could override any state claim to sovereign immunity in a matter committed to the Nation.

Justice Cushing's opinion relied on the express language of Article III to hold that Georgia might be sued in federal court. He dealt shortly with the objection that States' sovereignty would be thereby restricted so that States would be reduced to corporations: "As to corporations, all States whatever are corporations or bodies politic. The only question is, what are their powers?" *Id.*, at 468. Observing that the Constitution limits the powers of the States in numerous ways, he concluded that "no argument of force can be taken from the sovereignty of States. Where it has been abridged, it was thought necessary for the greater indispensable good of the whole." *Ibid.* From the opinion, it is not possible to tell with certainty what Justice Cushing thought about state sovereign immunity in state court, although his introductory remark is suggestive. The case, he wrote, "turns not upon the law or practice of *England,* although perhaps it may be in some measure elucidated thereby, nor upon the law of any other country whatever; but upon the Constitution established by the people of the *United States.*" *Id.*, at 466. It is clear that he had no sympathy for a view of sovereign immunity inherent in statehood and untouchable by national legislative authority.

Justice Blair, like Justice Cushing, relied on Article III, and his brief opinion shows that he acknowledged state sovereign immunity, but common law immunity in state court. First, Justice Blair asked hypothetically whether a verdict against the plaintiff would be preclusive if the plaintiff "should renew his suit against the State, in any mode in

which she may permit herself to be sued in her own Courts."
*Id.*, at 452. Second, he commented that there was no need
to require the plaintiff to proceed by way of petition:

> "When sovereigns are sued in their own Courts, such a
> method may have been established as the most respect-
> ful form of demand; but we are not now in a State-Court;
> and if sovereignty be an exemption from suit in any
> other than the sovereign's own Courts, it follows that
> when a State, by adopting the Constitution, has agreed
> to be amenable to the judicial power of the *United
> States*, she has, in that respect, given up her right of
> sovereignty." *Ibid.*

It is worth noting that for Justice Blair, the petition brought
in state court was properly called a suit. This reflects the
contemporary practice of his native Virginia, where, as we
have seen, *supra*, at 769, suits as of right against the State
were authorized by statute. Justice Blair called sovereignty
"an exemption from suit in any other than the sovereign's
own Courts" because he assumed that, in its own courts, a
sovereign will naturally permit itself to be sued as of right.

Justice Iredell was the only Member of the Court to hold
that the suit could not lie; but if his discussion was far-
reaching, his reasoning was cautious. Its core was that the
Court could not assume a waiver of the State's common law
sovereign immunity where Congress had not expressly
passed such a waiver. See 2 Dall., at 449 (dissenting opin-
ion). Although Justice Iredell added, in what he clearly
identified as dictum, that he was "strongly against" any con-
struction of the Constitution "which will admit, under any
circumstances, a compulsive suit against a State for the re-
covery of money," *ibid.*,[24] he made it equally clear that he

---

[24] The basis for the dictum may be found earlier in the opinion, where
Justice Iredell explained that it was uncertain whether Article III's exten-
sion of the federal judicial power to cases between a State and citizens of
another State "is to be construed as intending merely a transfer of juris-

understood sovereign immunity as a common law doctrine passed to the States with independence:

> "No other part of the common law of *England,* it appears to me, can have any reference to this subject, but that part of it which prescribes remedies against the crown. Every State in the *Union* in every instance where its sovereignty has not been delegated to the *United States,* I consider to be as compleatly sovereign, as the *United States* are in respect to the powers surrendered. The *United States* are sovereign as to all the powers of Government actually surrendered: Each State in the *Union* is sovereign as to all the powers reserved. It must necessarily be so, because the *United States* have no claim to any authority but such *as the States*

diction from one tribunal to another, or as authorizing the Legislature to provide laws for the decision of all possible controversies in which a State may be involved with an individual, without regard to any prior exemption." *Id.,* at 436. Justice Iredell seems to have believed that Article III authorized only the former; in other words, that the Framers intended to permit Article III jurisdiction in suits against a State only where some other existing court could also hear such a claim. Because in Justice Iredell's view, state courts could nowhere hear suits against a State at the time of ratification, see *id.,* at 434–435, it followed that Article III probably did not authorize such suits. Justice Iredell's reasoning, it must be said, differed markedly from the reasoning the Court adopts today. Justice Iredell believed simply that the Clause in Article III extending jurisdiction to controversies between a State and citizens of another State did not confer any extra lawmaking authority on Congress that was not found elsewhere in the Constitution. Because he could conceive of no other constitutional provision authorizing Congress to create a private right of action against a State, he concluded that none could exist. Today, of course, it is established that the commerce power authorizes Congress to create private rights as against the States. See *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528 (1985). The Court today takes the altogether different tack of arguing that state immunity from suit in state court was an inherent right of States preserved by the Tenth Amendment. Whatever Justice Iredell might have thought of this argument, it gets no support from his opinion.

*have surrendered to them:* Of course the part not sur-
renderred must remain as it did before." *Id.,* at 435.

This did not mean, of course, that the States had not dele-
gated to Congress the power to subject them to suit, but
merely that such a delegation would have been necessary on
Justice Iredell's view.

In sum, then, in *Chisholm* two Justices (Jay and Wilson),
one of whom had been present at the Constitutional Conven-
tion, took a position suggesting that States should not enjoy
sovereign immunity (however conceived) even in their own
courts; one (Cushing) was essentially silent on the issue of
sovereign immunity in state court; one (Blair) took a cautious
position affirming the pragmatic view that sovereign immu-
nity was a continuing common law doctrine and that States
would permit suit against themselves as of right; and one
(Iredell) expressly thought that state sovereign immunity at
common law rightly belonged to the sovereign States. Not
a single Justice suggested that sovereign immunity was an
inherent and indefeasible right of statehood, and neither
counsel for Georgia before the Circuit Court, see n. 21,
*supra,* nor Justice Iredell seems even to have conceived the
possibility that the new Tenth Amendment produced the
equivalent of such a doctrine. This dearth of support makes
it very implausible for today's Court to argue that a substan-
tial (let alone a dominant) body of thought at the time of
the framing understood sovereign immunity to be an inher-
ent right of statehood, adopted or confirmed by the Tenth
Amendment.[25]

---

[25] It only makes matters worse for the Court that two States, New York
and Maryland, voluntarily subjected themselves to suit in the Supreme
Court around the time of *Chisholm.* See Marcus & Wexler, Suits Against
States: Diversity of Opinion in the 1790s, 1993 J. Sup. Ct. Hist. 73,
74–78. At the Court's February Term, 1791, before *Chisholm,* Maryland
entered a plea (probably as to the merits) in *Van Staphorst* v. *Maryland,*
see 1993 J. Sup. Ct. Hist., at 74, a suit brought by a foreign citizen for debts
owed by the State, but then settled the suit to avoid the establishment of

The Court's discomfort is evident in its obvious recognition that its natural law or Tenth Amendment conception of state sovereign immunity is insupportable if *Chisholm* stands. Hence the Court's attempt to discount the *Chisholm* opinions, an enterprise in which I believe it fails.

The Court, citing *Hans* v. *Louisiana*, 134 U. S. 1 (1890), says that the Eleventh Amendment "overruled" *Chisholm*, *ante*, at 723, but the animadversion is beside the point. The significance of *Chisholm* is its indication that in 1788 and 1791 it was not generally assumed (indeed, hardly assumed at all) that a State's sovereign immunity from suit in its own courts was an inherent, and not merely a common law, advantage. On the contrary, the testimony of five eminent legal minds of the day confirmed that virtually everyone who understood immunity to be legitimate saw it as a common law prerogative (from which it follows that it was subject to abrogation by Congress as to a matter within Congress's Article I authority).

The Court does no better with its trio of arguments to undercut *Chisholm*'s legitimacy: that the *Chisholm* majority "failed to address either the practice or the understanding that prevailed in the States at the time the Constitution was adopted," *ante*, at 721; that "the majority suspected the decision would be unpopular and surprising," *ibid.*; and that "two Members of the majority acknowledged that the United States might well remain immune from suit despite" Article III, *ante*, at 722. These three claims do not, of course, go to the question whether state sovereign immunity was understood to be "fundamental" or "inherent," but in any case, none of them is convincing.

---

an adverse precedent on immunity, see *id.*, at 75. In *Oswald* v. *New York*, an action that commenced before *Chisholm* but that was continued after it, New York initially objected to jurisdiction, see 1993 J. Sup. Ct. Hist., at 77, but the suit was tried to a jury in the Supreme Court, and after New York lost, it paid the full jury verdict out of the State's treasury, *id.*, at 78.

With respect to the first, Justice Blair in fact did expressly refer to the practice of state sovereign immunity in state court, and acknowledged the petition of right as an appropriate and normal practice. This aside, the Court would have a legitimate point if it could show that the *Chisholm* majority took insufficient account of a body of practice that somehow indicated a widely held absolutist conception of state sovereign immunity untouchable and untouched by the Constitution. But of course it cannot.[26]

As for the second point, it is a remarkable doctrine that would hold anticipation of unpopularity the benchmark of constitutional error. In any event, the evidence proffered by the Court is merely this: that Justice Wilson thought the prerevolutionary conception of sovereignty misguided, 2 Dall., at 454–455; that Justice Cushing stated axiomatically that the Constitution could always be amended, *id.*, at 468; that Chief Justice Jay noted that the losing defendant might still come to understand that sovereign immunity is inconsistent with republicanism, *id.*, at 478–479; and that Attorney

---

[26] The Court thinks that Justice Iredell's adversion to state practice gives reason to think so, see *ante*, at 721 ("[D]espite the opinion of Justice Iredell, the majority failed to address . . ."). Even if Justice Iredell had been right about state practice, failure to respond to a specific argument raised by another Justice (as opposed to counsel) has even less significance with respect to this early Supreme Court opinion than it would have today, because the Justices may not have afforded one another the opportunity to read their opinions before they were announced. See 1 J. Goebel, The Oliver Wendell Holmes Devise: History of the Supreme Court of the United States, Antecedents and Beginnings to 1801, p. 728 (1971) ("There are hints . . . that there may have been no conference and that each Justice arrived at his conclusion independently without knowing what each of his brethren had decided"). Indeed, since "opinions were given only orally in the Supreme Court in the 1790s," 5 Documentary History of the Supreme Court, *supra* n. 21, at 164, n., it is possible that the opinion as reported by Dallas followed a document prepared by Wilson after the oral announcement of the opinion, *ibid.*; see also *id.*, at xxiv–xxv, in which case it is possible that the other Justices never heard certain arguments until publication.

General Randolph admitted that the position he espoused was unpopular not only in Georgia, but also in another State, probably Virginia.[27]   These items boil down to the proposition that the Justices knew (as who could not, with such a case before him) that at the ratifying conventions the significance of sovereign immunity had been, as it still was, a matter of dispute.   This reality does not detract from, but confirms, the view that the Framers showed no intent to recognize sovereign immunity as an immutably inherent power of the States.

As to the third objection, that two Justices noted that the United States might possess sovereign immunity notwithstanding Article III, I explained, *supra*, at 785–786, that Chief Justice Jay thought this possibility was purely practical, not at all legal, and without any implication for state immunity vis-à-vis federal claims.   Justice Cushing was so little troubled by the possibility he raised that he wrote, "If this be a necessary consequence, it must be so," *Chisholm, supra*, at 469, and simply suggested a textual reading that might have led to a different consequence.

Nor can the Court make good on its claim that the enactment of the Eleventh Amendment retrospectively reestablished the view that had already been established at the time of the framing (though eluding the perception of all but one Member of the Supreme Court), and hence "acted . . . to restore the original constitutional design," *ante*, at 722.[28]

---

[27] The circumlocution "another State, whose will must be always dear to me," *Chisholm*, 2 Dall., at 419, hints at Randolph's home State.   It seems odd to suggest that Randolph's acknowledgment of the unpopularity of his position in two States would somehow support the thought that the view was incorrect.   Randolph himself had urged the same position at the Virginia ratifying convention, see *supra*, at 775–776, and so knew perfectly well that Virginia had ratified with full knowledge that his position might be the law.

[28] It is interesting to note a case argued in the Supreme Court of Pennsylvania in 1798, in which counsel for the Commonwealth urged a version of the point that the Court makes here, and said that "[t]he language of the amendment, indeed, does not import an alteration of the Constitution,

There was nothing "established" about the position espoused by Georgia in the effort to repudiate its debts, and the Court's implausible suggestion to the contrary merely echoes the brio of its remark in *Seminole Tribe* that *Chisholm* was "contrary to the well-understood meaning of the Constitution." 517 U. S., at 69 (citing *Principality of Monaco* v. *Mississippi*, 292 U. S. 313, 325 (1934)). The fact that *Chisholm* was no conceptual aberration is apparent from the ratification debates and the several state requests to rewrite Article III. There was no received view either of the role this sovereign immunity would play in the circumstances of the case or of a conceptual foundation for immunity doctrine at odds with *Chisholm*'s reading of Article III. As an author on whom the Court relies, see *ante*, at 724, has it, "there was no unanimity among the Framers that immunity would exist," D. Currie, The Constitution in the Supreme Court: The First Hundred Years: 1789–1888, p. 19 (1985).[29]

---

but an authoritative declaration of its true construction." *Respublica* v. *Cobbet*, 3 Dall. 467, 472 (1798). The court expressly repudiated the historical component of this claim in an opinion by its Chief Justice: "When the judicial law [*i. e.*, the Judiciary Act of 1789] was passed, the opinion prevailed that States might be sued, which by this amendment is settled otherwise." *Id.*, at 475 (M'Kean, C. J.).

[29] The Court might perhaps respond that if the role of state sovereign immunity was not the subject of universal consensus in 1792, the enactment of the Eleventh Amendment brought the doctrine into the constitutional realm. The strongest form of this view must maintain that, notwithstanding the Amendment's silence regarding state courts and its exclusive focus on the federal judicial power, the motivation of the framers of the Eleventh Amendment must have been affirmatively to embrace the position that the States enjoyed the immunity from suit previously enjoyed by the Crown. On this account, the framers of the Eleventh Amendment said nothing about sovereign immunity in state court because it never occurred to them that such immunity could be questioned; had they thought of this possibility, they would have considered it absurd that States immune in federal court could be subjected to suit in their own courts.

The first trouble with this view is that it assumes that the Eleventh Amendment was intended to reach all federal-law suits, and not only those arising under diversity jurisdiction. If the framers of the Eleventh

It should not be surprising, then, to realize that although much post-*Chisholm* discussion was disapproving (as the States saw their escape from debt cut off), the decision had champions "every bit as vigorous in defending their interpretation of the Constitution as were those partisans on the other side of the issue." Marcus & Wexler, Suits Against States: Diversity of Opinion In The 1790s, 1993 J. Sup. Ct. Hist. 73, 83; see, *e. g.*, 5 Documentary History of the Supreme Court, *supra* n. 21, at 251–252, 252–253, 262–264, 268–269 (newspaper articles supporting holding in *Chisholm*); 5 Documentary History of the Supreme Court, *supra*, at 616 (statement of a committee of Delaware Senate in support of holding in *Chisholm*). The federal citizen-state diversity jurisdiction was settled by the Eleventh Amendment; Article III was not "restored."

---

Amendment had in mind only diversity cases, as the Court was prepared to concede in *Seminole Tribe*, see 517 U. S., at 69–70 ("The text dealt in terms only with the problem presented by the decision in *Chisholm* . . . . [I]t seems unlikely that much thought was given to the prospect of federal-question jurisdiction over the States"), then it might plausibly follow that the framers of that Amendment assumed that States possessed sovereign immunity in their own courts with respect to state law. But it certainly does not follow that the Amendment's authors would have thought that States enjoyed immunity in state court on questions of federal law. To accept this would require one to believe that the framers of the Eleventh Amendment were blind to an extremely anomalous application of sovereign immunity, under which a State is immune even when it is not the font of the law under which it is sued, cf. *infra*, at 797–798, 800. The Court today may labor under the misapprehension that sovereign immunity can apply where the sovereign is not the font of law, but the Court adduces no evidence to suggest that the framers of the Eleventh Amendment held such a view. And the framers were much closer than the Court to the theory of sovereign immunity according to which the font of law may not be subject to suit under that law. This leaves the Court in the position of supporting its view of what the Eleventh Amendment means by the "historical" assertion that the framers must have intended it to mean the same.

F

It is clear enough that the Court has no historical predicate to argue for a fundamental or inherent theory of sovereign immunity as limiting authority elsewhere conferred by the Constitution or as imported into the Constitution by the Tenth Amendment. But what if the facts were otherwise and a natural law conception of state sovereign immunity in a State's own courts were implicit in the Constitution? On good authority, it would avail the State nothing, and the Court would be no less mistaken than it is already in sustaining the State's claim today.

The opinion of this Court that comes closer to embodying the present majority's inherent, natural law theory of sovereign immunity than any other I can find was written by Justice Holmes in *Kawananakoa* v. *Polyblank*, 205 U. S. 349 (1907).[30] I do not, of course, suggest that Justice Holmes

---

[30] The temptation to look to the natural law conception had shown up occasionally before Justice Holmes's appointment, and goes back at least to *Beers* v. *Arkansas*, 20 How. 527 (1858), in which Chief Justice Taney wrote for the Court that "[i]t is an established principle of jurisprudence in all civilized nations that the sovereign cannot be sued in its own courts, or in any other, without its consent and permission," *id.*, at 529. But nothing turned on this pronouncement, because the outcome in the case would have been the same had sovereign immunity been understood as a common law property of the States. In *Nichols* v. *United States*, 7 Wall. 122 (1869), Justice Davis wrote: "Every government has an inherent right to protect itself against suits . . . . The principle is fundamental, [and] applies to every sovereign power . . . ." *Id.*, at 126. This description came in dicta, and the origin of the immunity had no bearing on the decision. Justice Bradley quoted both Hamilton and Chief Justice Taney in *Hans* v. *Louisiana*, 134 U. S. 1, 13, 17 (1890), but nothing there depended on the natural law approach, and in the main the opinion, whatever its other demerits, see *Seminole Tribe, supra*, at 119 (SOUTER, J., dissenting), understood state sovereign immunity as a common law concept, see *Hans, supra*, at 16 ("The suability of a State without its consent was a thing unknown to the law"). And the Court in *Seminole Tribe* may possibly have intended to hint at the natural law background of sovereign immunity when it said approvingly that the decision in *Hans* "'found its

was a natural law jurist, see "Natural Law," in O. Holmes, Collected Legal Papers 312 (1920, reprinted 1952) ("The jurists who believe in natural law seem to me to be in that naïve state of mind that accepts what has been familiar and accepted . . . as something that must be accepted").  But in *Kawananakoa* he gave not only a cogent restatement of the natural law view of sovereign immunity, but one that includes a feature (omitted from Hamilton's formulation) explaining why even the most absolutist version of sovereign immunity doctrine actually refutes the Court's position today: the Court fails to realize that under the natural law theory, sovereign immunity may be invoked only by the sovereign that is the source of the right upon which suit is brought.  Justice Holmes said so expressly: "A sovereign is exempt from suit, not because of any formal conception or obsolete theory, but on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." *Kawananakoa, supra,* at 353.

---

roots not solely in the common law of England, but in the much more fundamental "jurisprudence in all civilized nations." "  517 U. S., at 69 (quoting *Hans, supra,* at 17, in turn quoting *Beers* v. *Arkansas, supra,* at 529).  The Court's occasional seduction by the natural law view should not, however, obscure its basic adherence to the common law approach. In *United States* v. *Lee,* 106 U. S. 196 (1882), the Court explained that "the doctrine is derived from the laws and practices of our English ancestors," *id.,* at 205, and added approvingly that the petition of right "has been as efficient in securing the rights of suitors against the crown in all cases appropriate to judicial proceedings, as that which the law affords to the subjects of the King in legal controversies among themselves," *ibid.*  The Court went on to notice that at common law one reason given for sovereign immunity was the "absurdity" of the King's writ running against the King, *id.,* at 206, but, recognizing the distinct situation in the United States, the Court admitted candidly that "it is difficult to see on what solid foundation of principle the exemption from liability to suit rests," *ibid.* Even the dissent there discussed in great detail the common law heritage of the doctrine.  See *id.,* at 227–234 (opinion of Gray, J.).

His cited authorities stand in the line that today's Court purports to follow: Hobbes, Bodin, Sir John Eliot, and Baldus de Ubaldis. Hobbes, in the cited work, said this:

> "The sovereign of a Commonwealth, be it an assembly or one man, is not subject to the civil laws. For having power to make and repeal laws, he may, when he pleaseth, free himself from that subjection by repealing those laws that trouble him, and making of new; and consequently he was free before. For he is free that can be free when he will: nor is it possible for any person to be bound to himself, because he that can bind can release; and therefore he that is bound to himself only is not bound." Leviathan, ch. 26, §2, p. 130.

Jean Bodin produced a similar explanation nearly three-quarters of a century before Hobbes, see J. Bodin, Les six livres de la république, Bk. 1, ch. 8 (1577); Six Books of the Commonwealth 28 (M. Tooley transl. 1967) ("[T]he sovereign . . . cannot in any way be subject to the commands of another, for it is he who makes law"). Eliot cited Baldus for the crux of the theory: majesty is "a fulness of power subject to noe necessitie, limitted within no rules of publicke Law," 1 J. Eliot, De Jure Maiestatis: or Political Treatise of Government 15 (A. Grosart ed. 1882), and Baldus himself made the point in observing that no one is bound by his own statute as of necessity, see Commentary of Baldus on the statute *Digna vox* in Justinian's Code 1.14.4, Lectura super Codice folio 51b (Chapter *De Legibus et constitutionibus*) (Venice ed. 1496) *("nemo suo statuto ligatur necessitative")*.

The "jurists who believe in natural law" might have reproved Justice Holmes for his general skepticism about the intrinsic value of their views, but they would not have faulted him for seeing the consequence of their position: if the sovereign is not the source of the law to be applied, sovereign immunity has no applicability. Justice Holmes indeed explained that in the case of multiple sovereignties, the sub-

ordinate sovereign will not be immune where the source of the right of action is the sovereign that is dominant. See *Kawananakoa,* 205 U. S., at 353, 354 (District of Columbia not immune to private suit, because private rights there are "created and controlled by Congress and not by a legislature of the District"). Since the law in this case proceeds from the national source, whose laws authorized by Article I are binding in state courts, sovereign immunity cannot be a defense. After *Garcia* v. *San Antonio Metropolitan Transit Authority,* 469 U. S. 528 (1985), Justice Holmes's logically impeccable theory yields the clear conclusion that even in a system of "fundamental" state sovereign immunity, a State would be subject to suit *eo nomine* in its own courts on a federal claim.

There is no escape from the trap of Holmes's logic save recourse to the argument that the doctrine of sovereign immunity is not the rationally necessary or inherent immunity of the civilians, but the historically contingent, and to a degree illogical, immunity of the common law. But if the Court admits that the source of sovereign immunity is the common law, it must also admit that the common law doctrine could be changed by Congress acting under the Commerce Clause. It is not for me to say which way the Court should turn; but in either case it is clear that Alden's suit should go forward.

## II

The Court's rationale for today's holding based on a conception of sovereign immunity as somehow fundamental to sovereignty or inherent in statehood fails for the lack of any substantial support for such a conception in the thinking of the founding era. The Court cannot be counted out yet, however, for it has a second line of argument looking not to a clause-based reception of the natural law conception or even to its recognition as a "background principle," see *Seminole Tribe,* 517 U. S., at 72, but to a structural basis in the Constitution's creation of a federal system. Immunity, the

Court says, "inheres in the system of federalism established by the Constitution," *ante*, at 730, its "contours [being] determined by the Founders' understanding, not by the principles or limitations derived from natural law," *ante*, at 734. Again, "[w]e look both to the essential principles of federalism and to the special role of the state courts in the constitutional design." *Ante*, at 748. That is, the Court believes that the federal constitutional structure itself necessitates recognition of some degree of state autonomy broad enough to include sovereign immunity from suit in a State's own courts, regardless of the federal source of the claim asserted against the State. If one were to read the Court's federal structure rationale in isolation from the preceding portions of the opinion, it would appear that the Court's position on state sovereign immunity might have been rested entirely on federalism alone. If it had been, however, I would still be in dissent, for the Court's argument that state-court sovereign immunity on federal questions is inherent in the very concept of federal structure is demonstrably mistaken.

## A

The National Constitution formally and finally repudiated the received political wisdom that a system of multiple sovereignties constituted the "great solecism of an *imperium in imperio*," cf. Bailyn, The Ideological Origins of the American Revolution, at 223.[31] Once "the atom of sovereignty" had been split, *U. S. Term Limits, Inc.* v. *Thornton*, 514 U. S. 779,

---

[31] The authority of the view that Parliament's sovereignty must be indivisible had already been eroded in the decade before independence. Iredell himself, as early as 1774, rejected the applicability of the theory "to the case of several *distinct and independent legislatures* each engaged within a *separate* scale and employed about *different* objects," in the course of arguing for the possibility of a kind of proto-federalist relationship between the Colonies and the King. Iredell, Address to the Inhabitants of Great Britain, in 1 G. McRee, Life and Correspondence of James Iredell 205, 219 (1857, reprinted 1949); see Bailyn, The Ideological Origins of the American Revolution, at 224–225, and n. 64.

838 (1995) (KENNEDY, J., concurring), the general scheme of delegated sovereignty as between the two component governments of the federal system was clear, and was succinctly stated by Chief Justice Marshall: "In America, the powers of sovereignty are divided between the government of the Union, and those of the States. They are each sovereign, with respect to the objects committed to it, and neither sovereign with respect to the objects committed to the other." *McCulloch* v. *Maryland*, 4 Wheat. 316, 410 (1819).[32]

Hence the flaw in the Court's appeal to federalism. The State of Maine is not sovereign with respect to the national objectives of the FLSA.[33] It is not the authority that promulgated the FLSA, on which the right of action in this case depends. That authority is the United States acting through the Congress, whose legislative power under Article I of the Constitution to extend FLSA coverage to state employees has already been decided, see *Garcia* v. *San Antonio Metropolitan Transit Authority, supra,* and is not contested here.

---

[32] This is entirely consistent with, and indeed is a corollary of, the statement quoted by the Court that the States are "'no more subject, within their respective spheres, to the general authority than the general authority is subject to them, within its own sphere.'" *Ante,* at 714 (quoting The Federalist No. 39, p. 245 (C. Rossiter ed. 1961) (J. Madison)). The point is that matters subject to federal law are within the federal sphere, and so the States are subject to the general authority where such matters are concerned.

[33] It is therefore sheer circularity for the Court to talk of the "anomaly," *ante,* at 752, that would arise if a State could be sued on federal law in its own courts, when it may not be sued under federal law in federal court, *Seminole Tribe of Florida* v. *Florida,* 517 U. S. 44 (1996). The short and sufficient answer is that the anomaly is the Court's own creation: the Eleventh Amendment was never intended to bar federal-question suits against the States in federal court. The anomaly is that *Seminole Tribe,* an opinion purportedly grounded in the Eleventh Amendment, should now be used as a lever to argue for state sovereign immunity in state courts, to which the Eleventh Amendment by its terms does not apply.

Nor can it be argued that because the State of Maine creates its own court system, it has authority to decide what sorts of claims may be entertained there, and thus in effect to control the right of action in this case. Maine has created state courts of general jurisdiction; once it has done so, the Supremacy Clause of the Constitution, Art. VI, cl. 2, which requires state courts to enforce federal law and state-court judges to be bound by it, requires the Maine courts to entertain this federal cause of action. Maine has advanced no "'valid excuse,'" *Howlett* v. *Rose*, 496 U. S. 356, 369 (1990) (quoting *Douglas* v. *New York, N. H. & H. R. Co.*, 279 U. S. 377, 387–388 (1929)), for its courts' refusal to hear federal-law claims in which Maine is a defendant, and sovereign immunity cannot be that excuse, simply because the State is not sovereign with respect to the subject of the claim against it. The Court's insistence that the federal structure bars Congress from making States susceptible to suit in their own courts is, then, plain mistake.[34]

## B

It is symptomatic of the weakness of the structural notion proffered by the Court that it seeks to buttress the argument by relying on "'the dignity and respect afforded a State,

---

[34] Perhaps as a corollary to its view of sovereign immunity as to some degree indefeasible because "fundamental," the Court frets that the "power to press a State's own courts into federal service to coerce the other branches of the State . . . is the power first to turn the State against itself and ultimately to commandeer the entire political machinery of the State against its will and at the behest of individuals." *Ante,* at 749. But this is to forget that the doctrine of separation of powers prevails in our Republic. When the state judiciary enforces federal law against state officials, as the Supremacy Clause requires it to do, it is not turning against the State's executive any more than we turn against the Federal Executive when we apply federal law to the United States: it is simply upholding the rule of law. There is no "commandeering" of the State's resources where the State is asked to do no more than enforce federal law.

which the immunity is designed to protect,'" *ante*, at 749 (quoting *Idaho* v. *Coeur d'Alene Tribe of Idaho*, 521 U. S. 261, 268 (1997)), and by invoking the many demands on a State's fisc, *ante*, at 750–751. Apparently beguiled by Gilded Era language describing private suits against States as "'neither becoming nor convenient,'" *ante*, at 748 (quoting *In re Ayers*, 123 U. S. 443, 505 (1887)), the Court calls "immunity from private suits central to sovereign dignity," *ante*, at 715, and assumes that this "dignity" is a quality easily translated from the person of the King to the participatory abstraction of a republican State, see, *e. g., ante*, at 749 ("[C]ongressional power to authorize private suits against nonconsenting States in their own courts would be . . . offensive to state sovereignty"). The thoroughly anomalous character of this appeal to dignity is obvious from a reading of Blackstone's description of royal dignity, which he sets out as a premise of his discussion of sovereignty:

> "First, then, of the royal dignity. Under every monar-chical establishment, it is necessary to distinguish the prince from his subjects. . . . The law therefore ascribes to the king . . . certain attributes of a great and tran-scendent nature; by which the people are led to consider him in the light of a superior being, and to pay him that awful respect, which may enable him with greater ease to carry on the business of government. This is what I understand by the royal dignity, the several branches of which we will now proceed to examine." 1 Blackstone *241.

It would be hard to imagine anything more inimical to the republican conception, which rests on the understanding of its citizens precisely that the government is not above them, but of them, its actions being governed by law just like their own. Whatever justification there may be for an American

government's immunity from private suit, it is not dignity.[35] See *United States* v. *Lee*, 106 U. S. 196, 208 (1882).

It is equally puzzling to hear the Court say that "federal power to authorize private suits for money damages would place unwarranted strain on the States' ability to govern in accordance with the will of their citizens." *Ante*, at 750–751. So long as the citizens' will, expressed through state legislation, does not violate valid federal law, the strain will not be felt; and to the extent that state action does violate federal law, the will of the citizens of the United States already trumps that of the citizens of the State: the strain then is not only expected, but necessarily intended.

Least of all does the Court persuade by observing that "other important needs" than that of the "judgment creditor" compete for public money, *ante*, at 751. The "judgment creditor" in question is not a dunning bill collector, but a citizen whose federal rights have been violated, and a constitutional structure that stints on enforcing federal rights out of an abundance of delicacy toward the States has substituted politesse in place of respect for the rule of law.[36]

---

[35] Furthermore, the very idea of dignity ought also to imply that the State should be subject to, and not outside of, the law. It is surely ironic that one of the loci classici of Roman law regarding the imperial prerogative begins with (and is known by) the assertion that it is appropriate to the Emperor's dignity that he acknowledge (or, on some readings, at least claim) that he is bound by the laws. See Digna Vox, Justinian's Code 1.4.14 *("Digna vox maiestate regnantis legis alligatum se principem profiteri")* ("It is a statement worthy of the majesty of the ruler for the Prince to profess himself bound by the laws"); see Pennington, The Prince and the Law, 1200–1600, at 78, and n. 6.

[36] The Court also claims that subjecting States to suit puts power in the hands of state courts that the State may wish to assign to its legislature, thus assigning the state judiciary a role "foreign to its experience but beyond its competence . . . ." *Ante*, at 752. This comes perilously close to legitimizing political defiance of valid federal law.

## III

If neither theory nor structure can supply the basis for the Court's conceptions of sovereign immunity and federalism, then perhaps history might. The Court apparently believes that because state courts have not historically entertained Commerce Clause based federal-law claims against the States, such an innovation carries a presumption of unconstitutionality. See *ante*, at 744 (arguing that absence of statutes authorizing suits against States in state court suggests an assumed absence of such power). At the outset, it has to be noted that this approach assumes a more cohesive record than history affords. In *Hilton* v. *South Carolina Public Railways Comm'n*, 502 U. S. 197 (1991) (KENNEDY, J.), a case the Court labors mightily to distinguish, see *ante*, at 737,[37] we held that a state-owned railroad could be sued in state court under the Federal Employers' Liability Act, 45 U. S. C. §§ 51–60, notwithstanding the lack of an express congressional statement, because "'the Eleventh Amendment does not apply in state courts.'" *Hilton, supra,* at 205 (quoting *Will* v. *Michigan Dept. of State Police,* 491 U. S. 58, 63–64 (1989)).[38] But even if the record were less unkempt, the

---

[37] In its discussion of *Hilton,* the Court attempts to explain away the State's failure to raise a sovereign immunity defense by acknowledging candidly that when that case was decided, "it may have appeared to the State that Congress' power to abrogate its immunity from suit in any court was not limited by the Constitution at all." *Ante,* at 737. The reasoning of *Hilton* suggests that it appeared not only to the State, but also to the Court, that Congress could abrogate state sovereign immunity in state court. If Congress could not, then there would have been no jurisdiction in the case. The Court never even hinted that constitutional structure, much less the Tenth Amendment, might bar the suit, even though the dissent stressed that "the principle of federalism underlying the [Eleventh] Amendment pervades the constitutional structure," 502 U. S., at 209 (opinion of O'CONNOR, J.).

[38] Nor does *Poindexter* v. *Greenhow,* 114 U. S. 270 (1885), one of the Virginia Coupon Cases, fit comfortably with the assumption that state courts have exercised no disputed jurisdiction over their own governments on federal questions. Under its Funding Act of 1871, Virginia had issued

problem with arguing from historical practice in this case is that past practice, even if unbroken, provides no basis for demanding preservation when the conditions on which the practice depended have changed in a constitutionally relevant way.

It was at one time, though perhaps not from the framing, believed that "Congress' authority to regulate the States under the Commerce Clause" was limited by "certain under-

---

bonds that specified on their face that the attached coupons should be receivable at and after maturity for all taxes, debts, dues, and demands due the State. *Id.*, at 278. In 1882, however, Virginia passed a law requiring its tax collectors to accept nothing but gold, silver, or currency in payment of taxes. *Id.*, at 275. After the bonds reached maturity, Poindexter used them to pay state property taxes; Greenhow, the local tax collector, ignored the payment and took possession of an office desk in Poindexter's possession to sell it for unpaid taxes. Poindexter brought a common law action in detinue against the tax collector in state court for recovery of the desk, arguing that the later Virginia statute barring use of the coupons violated the Contracts Clause. Greenhow defended, *inter alia*, on the theory that the suit was "substantially an action against the State of Virginia, to which it has not assented." *Id.*, at 285. The Court rejected this claim by applying to the State of Virginia reasoning akin to, though broader than, that later adopted in *Ex parte Young*, 209 U. S. 123 (1908). We held that, where state legislative action is unconstitutional, it "is not the word or deed of the State, but is the mere wrong and trespass of those individual persons who falsely speak and act in its name," 114 U. S., at 290. Because the original bonds were binding contracts, the obligation of which Virginia could not constitutionally impair, "[t]he true and real Commonwealth which contracted the obligation is incapable in law of doing anything in derogation of it." *Id.*, at 293. It therefore could not be argued that the tax collector was acting on behalf of the State, because "[t]he State of Virginia has done none of these things with which this defence charges her. The defendant in error is not her officer, her agent, or her representative, in the matter complained of, for he has acted not only without her authority, but contrary to her express commands." *Ibid.* Although the tax collector had done nothing more than collect taxes under duly enacted state law, he was held to be liable to suit. Thus in the only case to have come before this Court specifically involving a claim of state sovereign immunity of constitutional magnitude in a State's own court, jurisdiction was upheld.

lying elements of political sovereignty . . . deemed essential to the States' 'separate and independent existence.'" *Garcia*, 469 U. S., at 547–548 (quoting *Lane County* v. *Oregon*, 7 Wall. 71, 76 (1869)). On this belief, the preordained balance between state and federal sovereignty was understood to trump the terms of Article I and preclude Congress from subjecting States to federal law on certain subjects. (From time to time, wage and hour regulation has been counted among those subjects, see *infra*, at 808.) As a consequence it was rare, if not unknown, for state courts to confront the situation in which federal law enacted under the Commerce Clause provided the authority for a private right of action against a State in state court. The question of state immunity from a Commerce Clause based federal-law suit in state court thus tended not to arise for the simple reason that Acts of Congress authorizing such suits did not exist.

Today, however, in light of *Garcia, supra* (overruling *National League of Cities* v. *Usery*, 426 U. S. 833 (1976)), the law is settled that federal legislation enacted under the Commerce Clause may bind the States without having to satisfy a test of undue incursion into state sovereignty. "[T]he fundamental limitation that the constitutional scheme imposes on the Commerce Clause to protect the 'States as States' is one of process rather than one of result." *Garcia, supra*, at 554. Because the commerce power is no longer thought to be circumscribed, the dearth of prior private federal claims entertained against the States in state courts does not tell us anything, and reflects nothing but an earlier and less expansive application of the commerce power.

Least of all is it to the point for the Court to suggest that because the Framers would be surprised to find States subjected to a federal-law suit in their own courts under the commerce power, the suit must be prohibited by the Constitution. See *ante*, at 741–743 (arguing on the basis of the "historical record" that the Constitution would not have been adopted if it had been understood to allow suit against States

in state court under federal law).  The Framers' intentions and expectations count so far as they point to the meaning of the Constitution's text or the fair implications of its structure, but they do not hover over the instrument to veto any application of its principles to a world that the Framers could not have anticipated.

If the Framers would be surprised to see States subjected to suit in their own courts under the commerce power, they would be astonished by the reach of Congress under the Commerce Clause generally.  The proliferation of Government, State and Federal, would amaze the Framers, and the administrative state with its reams of regulations would leave them rubbing their eyes.  But the Framers' surprise at, say, the FLSA, or the Federal Communications Commission, or the Federal Reserve Board is no threat to the constitutionality of any one of them, for a very fundamental reason:

> "[W]hen we are dealing with words that also are a constituent act, like the Constitution of the United States, we must realize that they have called into life a being the development of which could not have been foreseen completely by the most gifted of its begetters.  It was enough for them to realize or to hope that they had created an organism; it has taken a century and has cost their successors much sweat and blood to prove that they created a nation.  The case before us must be considered in the light of our whole experience and not merely in that of what was said a hundred years ago." *Missouri* v. *Holland,* 252 U. S. 416, 433 (1920) (Holmes, J.).

> " 'We must never forget,' said Mr. Chief Justice Marshall in *McCulloch,* [4 Wheat., at] 407, 'that it is a Constitution we are expounding.'  Since then this Court has repeatedly sustained the exercise of power by Congress, under various clauses of that instrument, over objects of which the Fathers could not have dreamed."

*Olmstead* v. *United States*, 277 U. S. 438, 472 (1928) (Brandeis, J., dissenting).

## IV

### A

If today's decision occasions regret at its anomalous versions of history and federal theory, it is the more regrettable in being the second time the Court has suddenly changed the course of prior decision in order to limit the exercise of authority over a subject now concededly within the Article I jurisdiction of the Congress. The FLSA, which requires employers to pay a minimum wage, was first enacted in 1938, with an exemption for States acting as employers. See *Maryland* v. *Wirtz*, 392 U. S. 183, 185–186 (1968). In 1966, it was amended to remove the state employer exemption so far as it concerned workers in hospitals, institutions, and schools. See *id.*, at 186–187, and n. 6. In *Wirtz*, the Court upheld the amendment over the dissent's argument that extending the FLSA to these state employees was "such a serious invasion of state sovereignty protected by the Tenth Amendment that it is . . . not consistent with our constitutional federalism." *Id.*, at 201 (opinion of Douglas, J.).

In 1974, Congress again amended the FLSA, this time "extend[ing] the minimum wage and maximum hour provisions to almost all public employees employed by the States and by their various political subdivisions." *National League of Cities*, 426 U. S., at 836. This time the Court went the other way: in *National League of Cities*, the Court held the extension of the Act to these employees an unconstitutional infringement of state sovereignty, *id.*, at 852; for good measure, the Court overturned *Wirtz*, dismissing its reasoning as no longer authoritative, see 426 U. S., at 854–855.

But *National League of Cities* was not the last word. In *Garcia*, decided some nine years later, the Court addressed the question whether a municipally owned mass-transit

system was exempt from the FLSA. 469 U. S., at 534, 536. In holding that it was not, the Court overruled *National League of Cities*, see 469 U. S., at 557, this time taking the position that Congress was not barred by the Constitution from binding the States as employers under the Commerce Clause, *id.*, at 554. As already mentioned, the Court held that whatever protection the Constitution afforded to the States' sovereignty lay in the constitutional structure, not in some substantive guarantee. *Ibid.*[39] *Garcia* remains good law, its reasoning has not been repudiated, and it has not been challenged here.

The FLSA has not, however, fared as well in practice as it has in theory. The Court in *Seminole Tribe* created a significant impediment to the statute's practical application by rendering its damages provisions unenforceable against the States by private suit in federal court. Today's decision blocking private actions in state courts makes the barrier to individual enforcement a total one.

---

[39] *Garcia* demonstrates that, contra the Court's suggestion, the FLSA does not impermissibly act upon the States, see *ante*, at 714. Rather, the FLSA, enacted lawfully pursuant to the commerce power, treats the States like other employers. The Court seems to have misunderstood Hamilton's statement in The Federalist No. 15 that the citizens are "'"the only proper objects of government,"'" *ante*, at 714 (quoting *Printz* v. *United States*, 521 U. S. 898, 919–920 (1997)). Hamilton's point is not, as the Court seems to think, that the National Government should dictate nothing to the States in order to protect their residual sovereignty. To the contrary, Hamilton, who was arguing against the extreme respect for state sovereignty in the Articles of Confederation, meant precisely that the National Government should not act as the leader of a "league," The Federalist No. 15, p. 95 (J. Cooke ed. 1961), mediating among several sovereignties, but as a "national government," *ibid.*, with power to produce obedience through the "COER[C]ION of the magistracy," *ibid.* Hamilton is therefore the wrong person to quote for the proposition that the National Government may not act upon the States, since his point was that the National Government should not be limited to acting through the medium of the States.

810

## B

The Court might respond to the charge that in practice it has vitiated *Garcia* by insisting, as counsel for Maine argued, Brief for Respondent 11–12, that the United States may bring suit in federal court against a State for damages under the FLSA, on the authority of *United States* v. *Texas,* 143 U. S. 621, 644–645 (1892). See also *Seminole Tribe,* 517 U. S., at 71, n. 14. It is true, of course, that the FLSA does authorize the Secretary of Labor to file suit seeking damages, see 29 U. S. C. § 216(c), but unless Congress plans a significant expansion of the National Government's litigating forces to provide a lawyer whenever private litigation is barred by today's decision and *Seminole Tribe,* the allusion to enforcement of private rights by the National Government is probably not much more than whimsy. Facing reality, Congress specifically found, as long ago as 1974, "that the enforcement capability of the Secretary of Labor is not alone sufficient to provide redress in all or even a substantial portion of the situations where compliance is not forthcoming voluntarily." S. Rep. No. 93–690, p. 27 (1974). One hopes that such voluntary compliance will prove more popular than it has in Maine, for there is no reason today to suspect that enforcement by the Secretary of Labor alone would likely prove adequate to assure compliance with this federal law in the multifarious circumstances of some 4.7 million employees of the 50 States of the Union.[40]

The point is not that the difficulties of enforcement should drive the Court's decision, but simply that where Congress has created a private right to damages, it is implausible to claim that enforcement by a public authority without any incentive beyond its general enforcement power will ever afford the private right a traditionally adequate remedy. No

---

[40] The most recent available data give 4,732,608 as the total number of employees of the 50 States of the Union, see State Government Employment Data: March 1997, http://www.census.gov/pub/govs/apes/97stus.txt.

one would think the remedy adequate if private tort claims against a State could only be brought by the National Government: the tradition of private enforcement, as old as the common law itself, is the benchmark. But wage claims have a lineage of private enforcement just as ancient, and a claim under the FLSA is a claim for wages due on work performed. Denying private enforcement of an FLSA claim is thus on par with closing the courthouse door to state tort victims unaccompanied by a lawyer from Washington.

So there is much irony in the Court's profession that it grounds its opinion on a deeply rooted historical tradition of sovereign immunity, when the Court abandons a principle nearly as inveterate, and much closer to the hearts of the Framers: that where there is a right, there must be a remedy. Lord Chief Justice Holt could state this as an unquestioned proposition already in 1702, as he did in *Ashby* v. *White*, 6 Mod. 45, 53–54, 87 Eng. Rep. 808, 815 (Q. B.):

> "If an act of parliament be made for the benefit of any person, and he is hindered by another of that benefit, by necessary consequence of law he shall have an action; and the current of all the books is so" (citation omitted).[41]

---

[41] The principle is even older with respect to rights created by statute, like the FLSA rights here, than it is for common law damages. Lord Holt in fact argued that the well-established principle in the context of statutory rights applied to common law rights as well. See *Ashby* v. *White*, 6 Mod., at 54, 87 Eng. Rep., at 816 ("Now if this be so in case of an Act of Parliament, why shall not common law be so too? For sure the common law is as forcible as any Act of Parliament"). A still older formulation of the statutory right appears in a note in Coke's Reports: "[W]hen any thing is prohibited by an act, although that the act doth not give an action, yet action lieth upon it." 6 Co. Rep., pt. 12, p. *100. Coke's Institutes yield a similar statement: "When any act doth prohibit any wrong or vexation, though no action be particularly named in the act, yet the party grieved shall have an action grounded upon this statute." 1 E. Coke, The Second Part of the Institutes of the Laws of England 117 (1797) (reprinted in 5B 2d Historical Writings in Law and Jurisprudence (1986)). In our case, of course, the statute expressly gives an action.

Blackstone considered it "a general and indisputable rule, that where there is a legal right, there is also a legal remedy, by suit or action at law, whenever that right is invaded."   3 Blackstone *23.   The generation of the Framers thought the principle so crucial that several States put it into their constitutions.[42]   And when Chief Justice Marshall asked about Marbury: "If he has a right, and that right has been violated, do the laws of his country afford him a remedy?," *Marbury v. Madison*, 1 Cranch 137, 162 (1803), the question was rhetorical, and the answer clear:

> "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury.   One of the first duties of government is to afford that protection. In Great Britain the king himself is sued in the respectful form of a petition, and he never fails to comply with the judgment of his court."   *Id.*, at 163.

Yet today the Court has no qualms about saying frankly that the federal right to damages afforded by Congress under the FLSA cannot create a concomitant private remedy.   The right was "made for the benefit of" petitioners; they have been "hindered by another of that benefit"; but despite what has long been understood as the "necessary consequence of law," they have no action, cf. *Ashby, supra,* at 53, 87 Eng. Rep., at 815.   It will not do for the Court to respond that a remedy was never available where the right in question was against the sovereign.   A State is not the sovereign when a federal claim is pressed against it, and even the English sovereign opened itself to recovery and,

---

[42] See, *e. g.*, A Declaration of Rights and Fundamental Rules of the Delaware State § 12 (1776), 2 Sources and Documents of United States Constitutions 197, 198 (W. Swindler ed. 1775); Md. Const., Art. XVII (1776), 4 *id.*, at 372, 373; Mass. Const., Art. XI (1780), 5 *id.*, at 92, 94; Ky. Const., Art. XII, cl. 13 (1792), 4 *id.*, at 142, 150; Tenn. Const., Art. XI, § 17 (1796), 9 *id.*, at 141, 148.

unlike Maine, provided the remedy to complement the right. To the Americans of the founding generation it would have been clear (as it was to Chief Justice Marshall) that if the King would do right, the democratically chosen Government of the United States could do no less.[43]   The Chief Justice's

---

[43] Unfortunately, and despite the Court's professed "unwilling[ness] to assume the States will refuse to honor the Constitution and obey the binding laws of the United States," *ante*, at 755, that presumption of the sovereign's good-faith intention to follow the laws has managed somehow to disappear in the intervening two centuries, despite the general trend toward greater, not lesser, government accountability.   Anyone inclined toward economic theories of history may look at the development of sovereign immunity doctrine in this country and see that it has been driven by the great and recurrent question of state debt, both in the aftermath of *Chisholm* and in the last quarter of the 19th century, see *Seminole Tribe*, 517 U. S., at 120–122 (SOUTER, J., dissenting).   And no matter what one may think of the quality of the legal doctrine that the problem of state debt has helped to produce, one can at least argue that States' periodic attempts to repudiate their debts were not purely or egregiously lawless, because those who held state-issued bonds may well have valued and purchased them with the knowledge that default was a real possibility.

Maine's refusal to follow federal law in the case before us, however, is of a different order.   Far from defaulting on debt to eyes-open creditors, Maine is simply withholding damages from private citizens to whom they appear to be due.   Before *Seminole Tribe* was decided, petitioners here were the beneficiaries of a District Court ruling to the effect that they were entitled to some coverage, and hence to some amount of damages, under the FLSA.   *Mills* v. *Maine*, 839 F. Supp. 3 (Me. 1993).   Before us, Maine has not claimed that petitioners are not covered by the FLSA, but only that it is protected from suit.   Indeed, Maine acknowledges that it may be sued by the United States in federal court for damages on the very same claim, Brief for Respondent 12–13, and we are told that Maine now pays employees like petitioners overtime as covered by the FLSA, *id.*, at 3.   Why the State of Maine has not rendered this case unnecessary by paying damages to petitioners under the FLSA of its own free will remains unclear to me.   The Court says that "it is conceded by all that the State has altered its conduct so that its compliance with federal law cannot now be questioned." *Ante*, at 759.   But the ambiguous qualifier "now" allows the Court to avoid the fact that whatever its forward-looking compliance, the State still has not paid damages to petitioners; had it done so, the case before us would be moot.

contemporaries might well have reacted to the Court's decision today in the words spoken by Edmund Randolph when responding to the objection to jurisdiction in *Chisholm:* "[The Framers] must have viewed human rights in their essence, not in their mere form." 2 Dall., at 423.

## V

The Court has swung back and forth with regrettable disruption on the enforceability of the FLSA against the States, but if the present majority had a defensible position one could at least accept its decision with an expectation of stability ahead. As it is, any such expectation would be naïve. The resemblance of today's state sovereign immunity to the *Lochner* era's industrial due process is striking. The Court began this century by imputing immutable constitutional status to a conception of economic self-reliance that was never true to industrial life and grew insistently fictional with the years, and the Court has chosen to close the century by conferring like status on a conception of state sovereign immunity that is true neither to history nor to the structure of the Constitution. I expect the Court's late essay into immunity doctrine will prove the equal of its earlier experiment in laissez-faire, the one being as unrealistic as the other, as indefensible, and probably as fleeting.